**UNITED STATES of America, Appellee,**

v.

**Harry J. REESE, Defendant–Appellant.**

**No. 1327, Docket 93–1630.**

United States Court of Appeals, Second Circuit.

Argued March 28, 1994.

Decided Aug. 25, 1994.

Steven A. Feldman, Feldman and Feldman, Hauppauge, NY, for defendant-appellant Harry J. Reese.

Peter J. Tomao, Asst. U.S. Atty. E.D.N.Y., Brooklyn, NY (Peter A. Norling, Asst. U.S. Atty., Zachary W. Carter, U.S. Atty. E.D.N.Y., of counsel), for appellee U.S.

Before: TIMBERS, KEARSE and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

For a number of years beginning in the mid–1970s, defendant and his partner owned mortgage originating and real estate companies. When the partners encountered financial difficulties their business habits changed. Their business over the next five years consisted of utilizing those companies to perpetrate a series of frauds against the United States and certain banks. Their fraudulent schemes involved real estate transactions and they left tracks as plain as fox prints in newly fallen snow just outside the hen house, which ultimately led to the criminal charges that were filed against them.

Harry Reese appeals from a judgment entered September 13, 1993 in the United States District Court for the Eastern District of New York (Wexler, J.), convicting him following a jury trial of one count of conspiracy to defraud the United States and to defraud certain financial institutions in violation of 18 U.S.C. § 371, and two counts of making false statements on a United States Department of Housing and Urban Development (HUD) Loan Application in violation of 18 U.S.C. § 1001. We affirm.

## BACKGROUND

### A. *Facts*

For a number of years during the mid–1980s, defendant Harry Reese and his partner, Steven H. Deutsch, processed a series of fraudulent loan applications through a mortgage company they operated. The company, Vanguard Mortgage Corporation (Vanguard), was formed by Deutsch in 1963. Reese became a partner in 1976. Following an investigation by the New York State Attorney General with regard to its business practices in 1984, Vanguard changed its name to Turnpike Holding Corporation (Turnpike). Vanguard and Turnpike were both located in East Meadow, on Long Island, New York. These companies were in the mortgage origination business and were HUD approved lenders. They participated in a program under which they originated HUD-insured mortgages and endorsed HUD's insurance. HUD reviewed only a small percentage of the originated mortgages.

As participants in this program, Vanguard and Turnpike were expected to engage in good lending practices, including verifying an applicant's employment, income, and ability

to repay the requested mortgage loan. HUD-insured loans were only available for residential properties. Individuals could obtain such loans to purchase residential properties on speculation, but for this type of transaction HUD required the prospective purchaser to put down 25 percent of the purchase price. HUD insured just 75 percent of the value. This differed from the owner-occupied home loan for which HUD required only 5 percent down and insured the remaining 95 percent. In either case, HUD required an "arms length" transaction, that is, that the purchaser and buyer be totally unrelated. In the five years between 1983 and 1988 Turnpike originated and endorsed 834 HUD-insured mortgages totaling $50 million.

The two men also owned two other companies, Creative Brokerage Corporation (Creative Brokerage) and Bean Bag Holding Corporation (Bean Bag), real estate companies that they used to purchase real estate on speculation. Reese and Deutsch's fraudulent scheme involved, in essence, the multiple transfer of properties to obtain the cash proceeds of mortgages based on their purported sales prices. A typical scheme ran as follows: Creative Brokerage or Bean Bag would first buy a residential property. Then, when its value appreciated—usually aided by a questionable appraisal—the property would be sold either to Reese or Deutsch, and as an owner-occupied property, HUD insurance was greater.

To finance the purchase, a mortgage processed by Turnpike would be taken out. As a "direct endorser" of HUD-insured mortgages, Turnpike could approve such mortgages independently. Deutsch and an employee of the company named Mary Mondanaro were "approved underwriters," meaning they could review and approve HUD-insured mortgages. Mondanaro worked under the direction of Reese. As a result, Deutsch's and Reese's own mortgages were frequently insured by HUD. The crux of the scheme hinged on the fact that with each sale of the property the dollar amount of the mortgages would increase, although in fact no money changed hands at the sale other than the funds received for the mortgage balance. After any outstanding debts were paid with the mortgage proceeds, the excess funds were appropriated by Reese and Deutsch.

The activities of the two men through their business enterprises ultimately prompted a government investigation and defendants' subsequent indictment. Reese and Deutsch were charged with one count of conspiracy to defraud the United States and to defraud financial institutions in violation of 18 U.S.C. § 371, two counts of making false statements on a United States Department of Housing and Urban Development Loan Application in violation of 18 U.S.C. § 1001, and two counts of executing a scheme or plan to defraud a financial institution in violation of 18 U.S.C. § 1344.

Deutsch pled guilty to conspiracy to defraud the United States and to defraud financial institutions pursuant to a cooperation agreement with the government that provided he would testify at Reese's trial. That trial began on January 19, 1993 and lasted four days. The evidence at trial focused on five loan applications—three insured by HUD and two filed with private banks—involving three pieces of real estate: 22 Maida Avenue, Deer Park, New York; 71 Duke Street, Deer Park, New York; and 38 High Lane, Levittown, New York.

Deutsch testified for the government, as did Mary Mondanaro and HUD Criminal Investigator Michael Carlucci. Their testimony, along with substantial physical evidence and testimony from several other witnesses, demonstrated that with respect to HUD-insured mortgages and bank mortgages secured on these properties, Reese made false statements regarding such things as his income, his debts and the value of the properties. Because the details of these transactions are not relevant to the issues raised on appeal, we will not discuss them any further, but will instead simply describe the transactions relating to one property for illustrative purposes.

On April 2, 1984 Reese and Deutsch's company, Creative Brokerage, purchased for $46,000 the 22 Maida Avenue property. Creative Brokerage obtained the purchase money from a so-called "hard money lender," an entity that lends money at the highest

rates permitted by the usury laws. Three weeks after the purchase, Creative Brokerage sold the property to Reese, who financed the purchase with a mortgage of $71,200 procured from Vanguard. In 1986 Reese refinanced the property with a HUD-insured mortgage obtained from Turnpike for $74,800. In order to obtain the mortgage, Reese submitted an application to HUD, on which he stated that his salary was $50,000 per year, that he intended to live at the property, and that he did not have any debts. The application was approved by Turnpike employee Mondanaro. Pursuant to HUD regulations, Mondanaro secured a verification of Reese's employment from Turnpike that indicated he earned $50,000 per year. Mondanaro did not bother to substantiate that figure by consulting Turnpike's records because Reese himself was in charge of Turnpike's payroll. In fact, Reese's W–2 forms indicated salaries of $26,000 in 1985, and $34,500 in 1986. Similarly, Mondanaro made no attempt to verify whether Reese was free of debt. In fact, he was not. Reese also had a residence where he lived and which he had no intention of abandoning. Mondanaro processed the application, and HUD guaranteed the mortgage.

In 1988 Reese sold the property to Deutsch. The two men prepared a sales contract that provided for a sale price of $139,990. The contract was submitted to Citibank, N.A. along with an application for a no-income check mortgage, *i.e.,* a mortgage that is given based on the value of the property alone without reference to the mortgagor's income. The $139,000 sale price qualified Deutsch for a $104,000 mortgage. To convince Citibank that this was a legitimate sale, Deutsch wrote Reese a check for $5,000—using $5,000 Reese had given him for that purpose—ostensibly to represent a deposit. Ultimately, the only money that changed hands was the $104,000 in mortgage proceeds Citibank gave to Deutsch. The mortgage balance due Citibank at the time of trial, including interest and late charges, was over $149,000.

Reese does not challenge the sufficiency of the evidence that established the foregoing. Rather, he contests several procedural aspects of the trial and the sentence imposed on him. We briefly set forth the facts relating to these issues.

### B. *Jury Charge Regarding Reasonable Doubt*

During the jury charge, Judge Wexler told the jury that Reese "is presumed to be innocent until his guilt has been proven beyond a reasonable doubt" and that "defendant never had the burden to prove his innocence, to produce any evidence at all, [or] even to testify." He defined reasonable doubt as "a doubt based on reason and common sense, a doubt which would make each of you hesitate to act in the more serious and important affairs of your own lives. This means after you've considered all the evidence in this case [if] you have a doubt about the defendant's guilt which appeals to your own experience, judgment and common sense, you must find the defendant not guilty."

After three hours of deliberations, the jury sent the judge a note asking him to "explain beyond a reasonable doubt." Judge Wexler first repeated the charge quoted above. Probably sensing that something more was required, he continued:

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are very few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. If based upon your consideration of the evidence you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If, on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

The defense did not object to this language.

### C. *Excuse of Juror 10*

A few days before the trial, a jury *voir dire* was conducted by a magistrate judge. During that questioning a potential juror informed the magistrate that she had reservations for a business trip to California and had to leave on Tuesday, January 26. The mag-

istrate replied: "We'll be done by then. . . . I think you will make it, ma'am." The juror was subsequently empaneled as Juror 10.

The jury began deliberating in the afternoon on Friday, January 22, 1993. Near the end of the day on Monday, January 25, Judge Wexler advised the parties of a note sent to him by the jury, which said "a juror has indicated before jury selection [that she] is not available tomorrow due to a prearranged business trip until Friday p.m." Judge Wexler then ruled that since this request had been made known earlier and because the jury specifically requested that she be excused, he was going to excuse her under the authority granted him by Fed.R.Crim.P. 23(b). The defense objected. Shortly thereafter, the judge recalled the jury and excused Juror 10.

### D. *Verdict, Fatico Hearing and Sentencing*

The next morning the jury returned its verdict. Reese was found guilty on the conspiracy count in connection with the HUD-insured mortgage and the Citibank bank mortgage obtained on the Maida Avenue property, and the HUD-insured mortgage on the Duke Street property. He was also found guilty on two substantive counts of making false statements to HUD relating to the mortgage applications for the Duke Street and High Lane properties, respectively. He was acquitted on the substantive fraud counts relating to the Citibank mortgage and a bank mortgage obtained for the Duke Street property.

The presentencing report prepared by the United States Probation Department recommended a base offense level of six and an addition of 10 levels pursuant to U.S.S.G. § 2F1.1(b)(1)(K), which prescribes the specific offense characteristic for the amount of loss. Another two level boost was recommended for more than minimal planning, resulting in an offense level of 18, which at Reese's Criminal History Category I yielded a sentence range of 27–33 months. Reese objected to the report's findings regarding the losses, and the district judge scheduled a *Fatico* hearing.

At the hearing the government introduced a summary list, Government Exhibit 1 Revised, showing 37 mortgages (all but two of which were HUD-insured) that were allegedly based on fraudulent applications or documents. The government notes that the underlying documentation for the summary was available to Reese for inspection. Investigator Carlucci testified that the information contained in the exhibit was derived from his investigation of Vanguard and Turnpike. Defendant also testified at the hearing.

Relying on the figures from the list, Judge Wexler calculated the loss at approximately $1,437,000. Both parties now recognize his calculations were $30,000 too high, but this discrepancy is irrelevant to the Sentencing Guideline range selected, which is between $1,000,001 and $2,000,000. *See* U.S.S.G. § 2F1.1(b)(1)(J). The sentencing court's total included the losses incurred by HUD on 13 loans that had been foreclosed ($237,677) and by Citibank on the Maida Street loan ($157,113), and the potential claims on nine loans in foreclosure ($1,013,021); it did not include the amount of one loan that was lawfully obtained or of those loans not in foreclosure.

Based on these losses the district judge arrived at an offense level of 17, rather than the 18 recommended in the presentence report. The sentencing range at level 17 was 24–30 months. Judge Wexler sentenced Reese to 26 months, to be followed by three years of supervised release, and a $150 special assessment. This appeal followed.

### DISCUSSION

In his attacks on his conviction, Reese raises three issues. First, he contends the clarifying instruction regarding reasonable doubt given after the jury request was wrong as a matter of law. Second, he asserts it was error to dismiss Juror 10 during deliberations. Third, Reese contests the calculation of his sentence. We consider each of these issues in turn.

### I   Reasonable Doubt Instruction

In response to the note from the jury, the trial judge instructed the jury, in

part, that it should acquit Reese if "there is a real possibility that he is not guilty." As an initial matter, because Reese failed to object to this instruction, we may reverse pursuant to Fed.R.Crim.P. 52(b) only for "plain error." *See United States v. Boothe,* 994 F.2d 63, 69 (2d Cir.1993); *United States v. Tillem,* 906 F.2d 814, 826 (2d Cir.1990). It is by now well settled that this rule authorizes us to correct only "particularly egregious errors," *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982), that is, those errors that may be viewed as affecting the fairness of the trial. *See United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985); *see also United States v. Locascio,* 6 F.3d 924, 942 (2d Cir.1993) (where defendant fails to object, a jury instruction is examined only to see if it caused a miscarriage of justice), *cert. denied,* —— U.S. ——, 114 S.Ct. 1646, 128 L.Ed.2d 365 (1994). The plain error doctrine is used in cases where an appellate court is persuaded a defendant has been denied a fair trial. *See United States v. Scarpa,* 913 F.2d 993, 1021 (2d Cir.1990).

■ Jury instructions must be viewed as a whole and in the context of the entire trial, not separately and in isolation. *See United States v. Dyer,* 922 F.2d 105, 107 (2d Cir. 1990); *United States v. Clark,* 765 F.2d 297, 303 (2d Cir.1985). We examine a specific instruction separately only if we are convinced that that portion of the charge misled the jury. *See Dyer,* 922 F.2d at 107; *United States v. Nadler,* 353 F.2d 570, 573 (2d Cir. 1965). Here, the trial court instructed the jury twice; it gave the jury an original charge and charged it again in response to the jury's note that expressed confusion regarding the meaning of the term "reasonable doubt." On each occasion the trial judge defined reasonable doubt as "a doubt which would make each of you hesitate to act in the more serious and important affairs of your own lives." We recognize there is an ongoing debate on the propriety of the "hesitate to act" language. *See Victor v. Nebraska,* —— U.S. ——, ——, 114 S.Ct. 1239, 1252, 127 L.Ed.2d 583 (1994) (Ginsburg, J., concurring). Nonetheless, we specifically approved of this jury formulation in *Perez v. Irwin,* 963 F.2d 499, 502 (2d Cir.1992), and so did the

Supreme Court in *Victor, see* —— U.S. at ——, 114 S.Ct. at 1250.

Of the two charges given, it was only in his clarifying charge on reasonable doubt that the trial judge used the potentially confusing "real possibility" language. In *United States v. McBride,* 786 F.2d 45, 51–52 (2d Cir.1986), caution in the use of that language was suggested, but its inclusion was not held to be a ground for reversal. *Cf. Victor v. Nebraska,* —— U.S. at ——, 114 S.Ct. at 1253 (Ginsburg, J., concurring) (describing an instruction containing the "real possibility" language as "clear, straightforward, and accurate"). Therefore, we find nothing in this record to suggest that the conviction must be reversed under the plain error doctrine.

## II The Dismissal of Juror 10

■ Reese makes several alternative arguments to support his assertion that it was an abuse of the trial court's discretion to excuse Juror 10. All are without merit. First, he avers the trial court was not acting within the scope of Fed.R.Crim.P. 23(b) when it excused the juror. According to appellant, because the juror's planned trip was revealed during *voir dire* conducted by a magistrate, her excusal did not arise during jury deliberations.

Rule 23(b) provides that in the absence of an agreement by the parties

> if the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the remaining 11 jurors.

Judge Wexler, as earlier stated, did not conduct the *voir dire* in this case, and at that time the magistrate and the parties believed the trial would be over before the date set for the juror's trip. Plainly, the judge's release of the juror—which took place after two days of deliberations—was one that occurred during deliberations.

In this respect, we see no practical difference between this case and *United States v. Stratton,* 779 F.2d 820 (2d Cir.1985) (excuse of a juror whose reason for leaving was to attend the Jewish holiday of Succoth), *cert.*

*denied,* 476 U.S. 1162, 106 S.Ct. 2285, 90 L.Ed.2d 726 (1986). In *Stratton,* the excusal of a juror under the rubric of Rule 23(b) was upheld even though the trial judge was aware of the reason why the juror wanted to be let go prior to the commencement of jury deliberations. *See id.* at 830–31.

▮ Next, Reese asserts the reason for the excuse—the juror's planned business trip—was not "just cause." The district judge's decision to dismiss the juror, or in other words his decision as to whether or not "just cause" exists, is reviewed for an abuse of discretion. *See United States v. Ruggiero,* 928 F.2d 1289, 1300 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 372, 116 L.Ed.2d 324 (1991); *United States v. Casamento,* 887 F.2d 1141, 1187 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990).

▮ Rule 23(b) is available to a judge conducting a trial not only when a juror seeking to leave has suffered a permanent or at least a lengthy incapacitation preventing further jury service. The "just cause" phrase is not so restricted; it embraces all kinds of problems—temporary as well as those of long duration—that may befall a juror during jury deliberations. *See Stratton,* 779 F.2d at 832. Concededly, a business trip seems a less than pressing concern, but it is one well within the broad discretion afforded a district court, who in the conduct of a trial before it must carefully consider each juror's well being. *See United States v. Molinares Charris,* 822 F.2d 1213, 1223 (1st Cir.1987) (affirming excusal of juror who was "nervous and upset"); *cf. United States v. Fajardo,* 787 F.2d 1523, 1525–26 (11th Cir. 1986) (affirming excusal of juror under Fed. R.Crim.P. 24(c) who appeared to have "sinus trouble"). In this case, like *Stratton,* there is not the slightest suggestion that Juror No. 10 was excused as a pretext in order that the jury might more readily arrive at a unanimous verdict. *See* 779 F.2d at 832.

▮ Reese maintains it was error not to examine Juror 10 regarding the circumstances of her planned business trip. Whether and to what extent a juror should be questioned regarding the circumstances of a need to be excused is also within the trial judge's sound discretion. *See Ruggiero,* 928 F.2d at 1301; *United States v. Sears,* 663 F.2d 896, 900 (9th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982); *see also United States v. Huntress,* 956 F.2d 1309, 1313 n. 1 (5th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2330, 124 L.Ed.2d 243 (1993). All that is needed to satisfy a prudent exercise of discretion is to be certain the trial court had sufficient information to make an informed decision. In this case, nothing would have been gained by a hearing designed to explore the specifics of the juror's trip. Under these circumstances, and because the district court knew that a continuance while the juror was away would result in a week's delay before the jury could resume deliberations, there was no abuse of discretion in excusing Juror 10.

## III  Sentencing

▮ The remaining issue is whether the district court properly found that Reese's conduct resulted in a loss in excess of $1.4 million. As a result of that finding, Reese's offense level was increased by nine pursuant to U.S.S.G. § 2F1.1(b)(1)(J) (Nov.1987). Because of an *ex post facto* problem, the district court used the version of the Guidelines in effect at the time the offenses were committed, rather than those applicable when the sentence was imposed. When imposing sentence the Guidelines to be used are those in effect on the date of sentencing, *see* 18 U.S.C. § 3553(a)(4) (1988), unless such application implicates the *Ex Post Facto* Clause of Article I of the Constitution. *See United States v. Adeniyi,* 912 F.2d 615, 618 (2d Cir.1990); *see generally Miller v. Florida,* 482 U.S. 423, 429–35, 107 S.Ct. 2446, 2450–54, 96 L.Ed.2d 351 (1987). Here, the Guidelines in effect at sentencing would have imposed an upward increment of 11, resulting in a heavier sentence than the increase of nine, required under the Guidelines in effect at the time of the criminal acts.

▮ Reese's strongest argument in challenging his sentence is that the amount included in calculating the losses for the nine loans in foreclosure did not reflect the loss suffered since HUD might well recover some

of the moneys owed when the properties are sold at foreclosure. It is well settled that at sentencing the government must establish by a preponderance of the evidence those disputed facts that are material. *See United States v. Streich,* 987 F.2d 104, 107 (2d Cir. 1993) (per curiam). "We review the district court's application of the Sentencing Guidelines *de novo* and the district court's findings of fact for clear error." *United States v. Stanley,* 12 F.3d 17, 20 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1572, 128 L.Ed.2d 216 (1994).

Upon so reviewing this record, it can be seen that the district judge calculated the loss at $1,437,000. This total was based on the actual losses incurred on the 13 HUD loans that had been foreclosed, the potential loss on the Citibank loan, and the potential losses on the nine HUD loans in foreclosure. The dollar amounts for these loans were taken from Government Exhibit 1 Revised, a summary of Reese's loan activity. Reese maintains that the figures in this concededly hearsay document were never proven by a preponderance of the evidence. In response, the government points out that the amounts were substantiated by HUD Criminal Investigator Carlucci at the *Fatico* hearing, and the underlying evidence for the summary was available for defendant's inspection.

On this dispute, two rules are particularly pertinent. First, when determining sentence, a sentencing court is free to consider hearsay evidence, evidence of uncharged crimes, dropped counts of an indictment and criminal activity resulting in acquittal. *See Streich,* 987 F.2d at 107 (citing *United States v. Pugliese,* 805 F.2d 1117, 1122 (2d Cir.1986)); *United States v. Concepcion,* 983 F.2d 369, 388 (2d Cir.1992) (sentencing court entitled to rely on any information known to it), *cert. denied,* —— U.S. ——, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993). Second, procedures used to resolve contested matters at sentencing are ordinarily left to the discretion of the district court. *See United States v. Prescott,* 920 F.2d 139, 144 (2d Cir.1990).

Here, Judge Wexler was entitled to rely on the dollar amounts as summarized by the government in the absence of an indication that the numbers were incorrect. Investigator Carlucci testified that the information contained in the exhibit was derived from his investigation of Vanguard and Turnpike. Moreover, there is no suggestion that the amounts were inflated, even though HUD may recover some portion of these losses when the properties are ultimately sold at foreclosure.

Similarly, we are not troubled by the district court's use of the $1,013,021 figure from the *potential* losses on nine loans in foreclosure. In a previous interpretation of the Guidelines used in this case, we stated that the calculation of loss consists of the "probable" loss resulting from the fraud, even though some portion of it may be recovered. *See United States v. Brach,* 942 F.2d 141, 143 (2d Cir.1991); *see also United States v. Lohan,* 945 F.2d 1214, 1219 (2d Cir.1991) (same). This reading is entirely consistent with the application notes for the version of U.S.S.G. § 2F1.1 (Nov. 1987) used at Reese's sentencing. In particular, Application Note 7 provides: "if a probable or intended loss that the defendant was attempting to inflict can be determined, that figure would be used if it was larger than the actual loss." And, Application Note 8 states: "[t]he amount of the loss need not be precise. . . . The court need only make a reasonable estimate of the range of loss, given the available information."

We therefore hold that under the approximation of the loss language employed by the Guidelines commentary, the sentencing court could presume that the loss for sentencing purposes would be equal to the potential bank claims made upon HUD. The government persuasively urges, in this connection, that other costs, such as the costs of maintaining the property and interest charges, might in any event cancel any potential recoupment derived from the foreclosure sale. Accordingly, the district court's computation of the loss at $1,013,021 was not clearly erroneous.

## CONCLUSION

For the reasons stated, the judgment of the district court is accordingly affirmed.