UNITED STATES of America

v.

Rafiq SABIR a/k/a "the Doctor,"
Defendant.

No. S4 05 Cr. 673 (LAP).

United States District Court,
S.D. New York.

Oct. 15, 2007.

Jennifer Gillum Rodgers, Victor L. Hou, Karl N. Metzner, U.S. Attorney's Office, New York, NY, for USA.

Edward David Wilford, Edward D. Wilford, Esq., Khurrum Basir Wahid, Wahid Vizcaino & Maher, LLP, Martin R. Stolar, Law Office of Martin R. Stolar, New York, NY, Natali J.H. Todd, Law Offices of Natali J.H. Todd, P.C., Brooklyn, NY, for Defendant.

*MEMORANDUM AND ORDER*

LORETTA A. PRESKA, District Judge.

A jury trial was held in this case from April 24, 2007 to May 21, 2007. Defendant Rafiq Sabir ("Dr. Sabir") was found guilty of conspiring to provide, and attempting to provide, "material support or resources" to al Qaeda, in the form of "medical support to wounded jihadists," in violation of 18 U.S.C. § 2339B. After the verdict was returned and the jurors were excused, Dr. Sabir requested 45 days to file his post-trial motions. The Court granted the request. Without benefit of further exten-

sion of time, on August 16, 2007, Dr. Sabir filed his post-trial motions for a judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure and for a new trial pursuant to Rule 33. For the reasons set forth below, Dr. Sabir's motions are denied.

## DISCUSSION

### A. Legal Standard for the Time to File Post-Trial Motions

Under Rule 33(b)(2), "[a]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 7 days after the verdict or finding of guilty." Similar language appears in Rule 29(c)(1), which provides that "[a] defendant may move for a judgment of acquittal ... within 7 days after a guilty verdict or after the court discharges the jury, whichever is later." The Advisory Committee notes for the 2005 amendment to Rule 33 (which are mirrored by those to Rule 29) further explain that:

> ... The defendant may, under Rule 45, seek an extension of time to file the underlying motion as long as the defendant does so within the seven-day period. But the court itself is not required to act on that motion within any particular time. *Further, under Rule 45(b)(1)(B), if for some reason the defendant fails to file the underlying motion for new trial within the specified time, the court may nonetheless consider that untimely underlying motion if the court determines that the failure to file it on time was the result of excusable neglect.*

(Emphasis added). Under Rule 45(b)(1)(B), "[w]hen an act must or may be done within a specified period, the court on its own may extend the time, or for good cause may do so on a party's motion made ... after the time expires if the party failed to act because of excusable neglect."

■ Although none of Rules 29, 33, or 45 defines "excusable neglect," courts apply an equitable test that considers all relevant circumstances, including: (1) the danger of prejudice to the non-moving party, (2) the length of delay and impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the moving party, and (4) whether the moving party acted in good faith. *See Williams v. KFC Nat'l Mgmt. Co.*, 391 F.3d 411, 415 (2d Cir.2004) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)); *see also Silivanch v. Celebrity Cruises, Inc.*, 333 F.3d 355, 366 n. 6 (2d Cir.2003).

### B. Application to Dr. Sabir's Post-Trial Motions

■ Dr. Sabir's motions under Rules 29 and 33 are dismissed as untimely for three reasons. First, the length of delay and impact on judicial proceedings weigh in favor of dismissal. After receiving an extension of 45 days in which to file his post-trial motions, Dr. Sabir delayed filing his motions until nearly three months after the verdict in this case, having not asked for any further extension of time to file. In addition, the Government has a significant interest in the finality of the verdict and in getting Dr. Sabir sentenced.

Second, it is at least possible that the Government would be prejudiced by Dr. Sabir's delay in filing his motion for a new trial. As time goes by, the likelihood of trial witnesses' becoming unavailable increases.

Third, because Dr. Sabir has no reason for the delay in filing these motions, this factor weighs in favor of dismissal. As the motions contain no alleged new evidence, filing the motions was entirely within his control. Moreover, the proffered bases for Dr. Sabir's motions do not present "good

cause." The issues surrounding the jury's exposure to and consideration of extrinsic evidence were raised by defense counsel at trial and were rejected by the Court at that time. Similarly, as discussed *supra* at note 1, the issues raised by defense counsel in support of Dr. Sabir's motion for acquittal were previously raised and rejected by this Court.

■■■ Assuming *arguendo* that the Court were to address the substance of Dr. Sabir's motions, they fail on the merits.[1]

### C. Legal Standard for a New Trial Under Rule 33

■■■ Rule 33 provides that the court "may . . . grant a new trial if the interests of justice so require." Although "the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29," that discretion should be exercised " 'sparingly' " and only in " 'the most extraordinary circumstances.' " *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir.2001) (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir.1992)). Indeed, "motions for a new trial are disfavored in this Circuit." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir.1995). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134 (citing *Sanchez*, 969 F.2d at 1414). As the Court of Appeals has explained:

> In making this assessment, the judge must examine the totality of the case. All of the facts and circumstances must be taken into account. An objective evaluation is required. There must be a real concern that an innocent person may have been convicted. It is only when it appears that an injustice has been done that there is a need for a new trial "in the interest of justice."

*Sanchez*, 969 F.2d at 1414 (footnote omitted).

### D. Application to Dr. Sabir's Motion for a New Trial

#### 1. Removal of Juror # 10 and Continuation With Eleven Jurors Instead of Substituting an Alternate Juror

##### i. Relevant Facts

Following the Court's legal instructions, the jury retired to deliberate on Thursday, May 17, 2007. That same day, the Court was reminded by Juror # 10 that she had pre-existing plans to attend a family reunion the following day, May 18, 2007, and

---

1. Even if Dr. Sabir's motion for acquittal was filed timely, the Court would not grant him that relief. Two of the bases for his motion relate to the constitutionality of 18 U.S.C. § 2339B and the sufficiency of the evidence presented at trail. Both challenges were previously raised and rejected by this Court. With respect to Dr. Sabir's challenge to the constitutionality of 18 U.S.C. § 2339B, the Court twice rejected that argument, once on the record in open court (*see* Transcript of Conference, dated January 17, 2007, at 34/17–36/24) and again in a written decision issued thereafter (*see United States v. Shah*, 474 F.Supp.2d 492 (S.D.N.Y.2007)). With respect to Dr. Sabir's claim that the evidence was insufficient to support his conviction, the Court rejected an identical request made by his defense counsel at the close of the evidence. (Trial Transcript ("Tr.") at 2543–44). The "law of the case" doctrine is discretionary and provides that "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case," absent an intervening ruling from a higher court or change in the applicable law. *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir.1991) (citing *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)); *United States v. Crowley*, 318 F.3d 401, 420 (2d Cir.2003); *Aramony v. United Way of America*, 254 F.3d 403, 410 (2001). Since neither circumstance is present here (and Dr. Sabir does not argue the contrary), the Court declines to revisit its aforementioned rulings.

would not be available to deliberate at all on that day. (Tr. 2552). The Court solicited the parties' views, noting that the Court had planned to ask the jurors whether they wished to deliberate on Friday, May 18, 2007, given that the trial had already taken longer than expected and that to send the jurors home on Thursday afternoon without having the opportunity to continue until the following Monday might put undue pressure on the jury to reach a hasty verdict. Dr. Sabir objected to the replacement of Juror # 10 for her failure to be present for deliberations on May 18, 2007, instead requesting that the jury be excused on Thursday, May 17, 2007, and, assuming no verdict, to return the following Monday to continue their deliberations. (Tr. 2553). Ultimately, before the Court had the opportunity to ascertain from the jurors whether they wished to deliberate on Friday, May 18, 2007, Juror # 10 agreed to stay that day and continue her participation. (Tr. 2558).

The following morning, Friday, May 18, 2007, during the course of the jury's deliberations, the Court received a note from Juror # 10, who indicated, notwithstanding her prior agreement to continue to deliberate through May 18, 2007 and, if necessary, on Monday, May 21, 2007, that she wished to leave immediately and would not return until Tuesday, May 22, 2007. (Tr. 2658–59). At this point, the parties agreed that Juror # 10 should be dismissed. (Tr. 2659). The Government suggested proceeding with eleven jurors, and Dr. Sabir proposed to replace Juror # 10 with the first alternate juror. (Tr. 2659–60).

The Court dismissed Juror # 10 and decided to proceed with eleven jurors as permitted by Rule 23. (Tr. 2663). In so doing, the Court noted that the jurors had been told at the outset that the case would take approximately three weeks and that proceedings were at that time at the end of the fourth week. (Tr. 2663). The Court also noted that proceeding in the manner Dr. Sabir suggested would require the jury to be sent home on Friday, May 18, 2007, to return with the replacement juror on Monday, May 21, 2007, and the jury then instructed to recommence deliberations—all resulting in further extension of the time required for the jurors' service. (Tr. 2663). Finally, the Court expressed concern that other jurors may have increasingly pressing problems with their employers as time went on, and that these time pressures could result in a hurried verdict. (Tr. 2663–64).

ii. *Legal Standard for a Jury of Eleven Persons*

■ Rule 23(b)(3) provides that "[a]fter the jury has retired to deliberate, the court may permit a jury of 11 persons to return a verdict, even without a stipulation by the parties, if the court finds good cause to excuse a juror." The Rule affords district courts "wide latitude" in exercising their discretion to discharge jurors and proceed with eleven-member juries. *See United States v. Paulino,* 445 F.3d 211, 226 (2d Cir.2006) (quoting *United States v. Gibson,* 135 F.3d 257, 259 (2d Cir.1998)); *see also United States v. Baker,* 262 F.3d 124, 129–30 (2d Cir.2001); *United States v. Reese,* 33 F.3d 166, 173 (2d Cir.1994); *United States v. Ruggiero,* 928 F.2d 1289, 1300 (2d Cir.1991).

■ "The 'just cause' phrase is not so restricted; it embraces all kinds of problems—temporary as well as those of long duration—that may befall a juror during jury deliberations." *Reese,* 33 F.3d at 173; *see also United States v. Stratton,* 779 F.2d 820, 832 (2d Cir.1985) ("We read the 'just cause' standard more broadly to encompass a variety of temporary problems that may arise during jury deliberations, confronting the trial judge with the need to exercise sound discretion as to the pro-

cedure to be followed at a particularly sensitive stage of the trial."). "All that is needed to satisfy a prudent exercise of discretion is to be certain the trial court had sufficient information to make an informed decision." *Paulino*, 445 F.3d at 226 (quoting *Reese*, 33 F.3d at 173).

### iii. *Discussion*

Dr. Sabir asserts that he should be granted a new trial because the Court erred in deciding to proceed with eleven jurors, claiming that instead of doing so, the Court should have added the first alternate juror to the panel. (Mem. at 5 ("[A]lternate jurors were available to replace [J]uror # 10 when she had to be discharged.")).[2] Dr. Sabir did not object at trial, and does not assert now, that it was error for the Court to excuse Juror # 10.

The decision to proceed with eleven jurors was the most appropriate option given the circumstances. As both parties agreed, the Court had good cause to excuse Juror # 10, who essentially declared herself unwilling to stay to continue deliberations. (Tr. 2659). And Dr. Sabir does not dispute the choices that were available at that time (mid-day on Friday, May 18, 2007): either the jury could continue deliberating as eleven jurors once Juror # 10 was dismissed, or the first alternate juror

would have to be contacted and brought back to rejoin the jury, which certainly would not have been accomplished before Monday, May 21, 2007, and the newly-constituted jury would be instructed to begin anew with their deliberations at that time. *See* Fed.R.Crim.P. 24(c)(3) ("If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew.").

Dr. Sabir claims that "[w]hile it is true the jury had been deliberating over the course of two days ... at the point [Juror # 10] was excused the jury had in real time only been deliberating for a matter of hours." (Mem. at 5.) However, by the time of Juror # 10's dismissal, the trial already had exceeded substantially its expected length; jurors were starting to have issues with their employers in which the Court was having to intervene; and to bring back the first alternate juror would have required the jury to start its deliberations over again. Given these issues, there was ample cause to dismiss Juror # 10 and proceed with a jury of eleven members.[3]

### 2. *Juror # 8's Internet Research During Deliberations of Dr. Sabir's Co-conspirator*

#### i. *Relevant Facts*

At or about 12:00 p.m. on Monday, May 21, 2007, the third day of deliberations, the

---

**2.** "Mem." refers to the "Memorandum of Law in Support of Pretrial Motions for Defendant Rafiq Sabir," filed on August 16, 2007.

**3.** To the extent Dr. Sabir implies that the Court should have decided to replace Juror # 10 with the first alternate juror because both were African–American (*see* Mem. at 5 n. 1), that argument is unpersuasive. In essence, Dr. Sabir appears to be saying that, even if it were perfectly acceptable to proceed with eleven jurors, the Court should not have done so because of the race of the first alternate juror. This suggestion would run afoul of the spirit of the prohibition against race-

conscious jury selection decisions set forth in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *See also United States v. Nelson*, 277 F.3d 164, 207–13 (2d Cir.2002) (vacating the convictions of two defendants who were charged in connection with the death of Yankel Rosenbaum which emanated from the violence that occurred in the Crown Heights area of Brooklyn, New York, on August 19, 1991: "hold[ing] that the trial court's race– and religion-based reconstruction of the jury, whatever its motivation, is impermissible in light of the courts' special commitment to equal protection").

jury sent out a note stating that it had come out during deliberations that Tarik Shah, Dr. Sabir's co-conspirator, pleaded guilty. (Tr. 2681). At the same time, another note was received by the Court stating, among other things, that Juror # 8 had said she saw or did research on Tarik Shah. (Tr. 2681–82). Dr. Sabir immediately moved for a mistrial. (Tr. 2682).

In response to the Government's argument that Dr. Sabir could not have been prejudiced by the information that Tarik Shah had pleaded guilty because that was not inconsistent with Dr. Sabir's litigation strategy, Dr. Sabir stated—not entirely correctly [4]—that there had been "absolutely no indication whatsoever from the defense as to any outcome of the judicial proceedings against Tarik Shah." (Tr. 2687).

The Court indicated its intention to question Juror # 8 about what research, if any, she may have done. Following the parties' agreement, to proceed in this manner with respect to Juror # 8, Juror # 8 was called into the robing room with the parties present and asked whether she had seen or done any research on Tarik Shah. (Tr. 2688, 2693). Juror # 8 stated that it was "[n]ot research, but I was curious as to why Mr. Shah was not here, and what happened to him . . . . So I Googled Tarik Shah." (Tr. 2694). When asked the results of her search, Juror # 8 stated that "I found that Tarik Shah pled guilty to something." (Tr. 2693). When the Court asked whether there was anything else that Juror # 8 had learned, she responded in the negative. (Tr. 2693). Juror # 8 was then instructed that the verdict as to Dr. Sabir was to be based solely on the evidence put forth in the courtroom, and was asked whether she was able to follow that instruction. (Tr. 2693). Juror # 8

responded "Definitely." (Tr. 2693). And when asked whether anything about the information she had seen on the internet would keep her from being fair and impartial, Juror # 8 said "no." (Tr. 2694).

The Court granted defense counsel's request to ask a follow-up question to ascertain whether the information learned by Juror # 8 had been shared with other jurors; in response to the question, Juror # 8 stated that "[a] few people heard it." (Tr. 2696). Defense counsel then requested that Juror # 8 be asked who had heard it. The Court declined this request as being overly intrusive into the deliberative process and reiterated that it planned to instruct the entire jury about their obligations to decide the case based solely on the evidence admitted at trial and to inquire whether any juror would be unable to do so. (Tr. 2697). The Court also declined defense counsel's request to ask Juror # 8 whether she had Googled Dr. Sabir's name, noting that there was no cause to make that inquiry. (Tr. 2697).

As the parties had agreed, the jury was then instructed in pertinent part that:

> It is your function in this case to decide the issues of fact. Your decision on the issues of fact is to be based solely on the evidence. Nothing I say is evidence. Nothing any of the lawyers say is evidence. Questions by themselves are not evidence. Objections are not evidence. Testimony that has been excluded or which you're told to disregard is not evidence. The evidence consists of the sworn testimony of the witnesses and the exhibits that have been received into evidence for your consideration. Also, in some instances there were facts the lawyers agreed to or facts that I instructed you to find . . . . You may not

4. *See* note 7, *infra.*

draw any inference, favorable or unfavorable, toward the government or the defendant from the fact that any person in addition to the defendant is not on trial here. You also may not speculate as to the reasons why other persons are not on trial. Those matters are wholly outside your concern and have no bearing on your function as jurors .... Now, ladies and gentlemen, is there any juror who is unable or unwilling to follow those instructions? Anyone?

(Tr. 2699–2700). Following this instruction and inquiry, the jury returned to its deliberations.

Later that day, at or about 3:05 p.m., the jury sent out a note stating that they reached an "impasse" on the substantive count which charged Dr. Sabir with attempting to provide "material support or resources" to al Qaeda. (Tr. 2701). Dr. Sabir requested a mistrial as to that count. (Tr. 2703.) Instead, the Court instructed the jury to continue its deliberations pursuant to *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896) (the "*Allen* charge").[5] (Tr. 2708–10). As part of that instruction, the Court stated that "under no circumstances must any juror yield his or her conscientious judgment."[6] (Tr. 2709.) In addition, the Court advised the jury of its right and option to return only a partial verdict. (Tr. 2710–11). Finally, at or about 5:45 p.m., the jury delivered its verdict of guilty on both counts. (Tr. 2741).

ii. *Legal Standard for Jury's Exposure to Extra–Record Information*

While extra-record information that comes to the attention of a juror is "presumed prejudicial," *United States v. Greer*, 285 F.3d 158, 173 (2d Cir.2002) (citing *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954)), this presumption may be rebutted by a "showing that the extra-record information was harmless," *Bibbins v. Dalsheim*, 21 F.3d 13, 16 (2d Cir.1994). The Court of Appeals has stated that "[t]he touchstone of [a] decision ... is thus not the mere fact of infiltration of some molecules of extra-record matter ... but the nature of what has been infiltrated and the probability of prejudice." *Bibbins*, 21 F.3d at 16 (quoting *United States ex rel. Owen v. McMann*, 435 F.2d 813, 818 (2d Cir.1970)).

"A trial court's post-verdict determination of extra-record prejudice must be an objective one, focusing on the information's probable effect on a hypothetical average juror." *Greer*, 285 F.3d at 173 (internal quotations and citation omitted). If a "hypothetical average juror" would not have been influenced by the extrinsic information learned by the jury, a new trial

---

**5.** The Court of Appeals has described the *Allen* charge, in pertinent part, as follows:

> In *Allen*, the Supreme Court approved of supplemental instructions given to a deadlocked jury urging them to continue deliberating and for the jurors in the minority to listen to the majority's arguments and ask themselves whether their own views were reasonable under the circumstances. 164 U.S. at 501, 17 S.Ct. 154. The instructions in *Allen* included statements directing that "the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows," and that it was the jury's duty "to decide the

case if they could conscientiously do so." *Id.* These statements served to remind jurors in the minority that a verdict was not required, and that no juror should surrender the juror's conscientiously held views for the sake of rendering a verdict.

*Spears v. Greiner*, 459 F.3d 200, 204 (2d Cir. 2006).

**6.** *See Spears*, 459 F.3d at 205 ("when an *Allen* charge directs jurors to consider the views of other jurors, specific cautionary language reminding jurors not to abandon their own conscientious beliefs is generally required").

motion based on the jury's access to that information must be denied. *Id.* at 174.

 In reviewing extra-record information, "[t]he trial court should assess the 'possibility of prejudice' by reviewing the entire record, analyzing the substance of the extrinsic evidence, and comparing it to that information of which the jurors were properly aware." *United States v. Weiss,* 752 F.2d 777, 783 (2d Cir.1985) (citation omitted). "The court may properly conclude that such extra-record information was non-prejudicial if it determines that an abundance of properly admitted evidence relevant to this matter exists." *Id. See also United States v. Burket,* 480 F.2d 568, 571 (2d Cir.1973) ("Since nothing was added to the evidence" against defendant by the improperly submitted document "its presence in the jury room could hardly have had any prejudicial impact."). "Additionally, [a] trial court has broad discretion in reviewing the issue of the prejudicial effect of the infiltration of extra-record evidence into the deliberations of the jury." *Weiss,* 752 F.2d at 783 (citations omitted).

### iii. *Discussion*

Dr. Sabir asserts that a new trial should be ordered because the Court failed to conduct an adequate inquiry of Juror # 8 and the prejudice was self-evident from the short amount of time it took the jury to reach its verdict after being exposed to extra-record information. (Mem. at 10–11). In particular, Dr. Sabir attempts to connect the "perfunctory questioning" of Juror # 8 to the Court's prior decision to remove Juror # 10 and proceed with only 11 jurors—the minimum number required, absent a stipulation for a smaller jury, under Rule 23. "In the [C]ourt's desire to arrive at a verdict, the [C]ourt shielded the tainted juror [*i.e.,* Juror # 8] from the full inquiry that the jurors [sic] actions neces-

sitated and ensured that the number of jurors necessary to reach a verdict was preserved." (Mem. at 11).

 Dr. Sabir's argument that he was deprived of his Sixth Amendment right to a trial by an impartial jury as a result of the extra-record information fails for several reasons. First, the information at issue here—that Dr. Sabir's co–conspirator Tarik Shah pleaded guilty to "something"—simply would not have influenced the hypothetical average juror in a way that is prejudicial to Dr. Sabir. A large part of Dr. Sabir's defense strategy, given the overwhelming evidence of Tarik Shah's views and intentions that was introduced into evidence, was to distance himself from Tarik Shah and to argue to the jury that he believed and acted differently from Tarik Shah. For example, during his closing argument, defense counsel went through the testimony of nearly every witness, explaining that while many of them provided detailed testimony about Tarik Shah, they did not say much about Dr. Sabir. (Tr. 2400–06). Defense counsel then argued that:

> This case—if this was a case about Tarik Shah, I wouldn't even have got up. *Tarik Shah is guilty.* But this case is not about Tarik Shah. It is about Dr. Sabir. It is about the relationship between Dr. Sabir and Tarik Shah. The Government would have you believe that there is no separation; that Tarik Shah is Dr. Sabir . . . . But you can't do that. You have to look at the evidence. You have to look at the evidence and understand that whatever Tarik Shah is, whatever Tarik Shah did, Dr. Sabir is a separate entity; a separate entity who has to be judged by you based on the evidence the government introduced against him, not against Tarik Shah.

(Tr. 2406–07) (emphasis added).[7]

This strategy did not appear for the first time at closing arguments. During the cross-examination of virtually every Government witness who testified about Tarik Shah, defense counsel emphasized the differences between Tarik Shah and Dr. Sabir. *See, e.g.,* Tr. 321–22 (eliciting from James Wajid that Dr. Sabir was not present for Tarik Shah's conversations about jihad); Tr. 521–23 (eliciting from Samuel Nelson that he was asked to look for martial arts training locations by Tarik Shah, but not Dr. Sabir); Tr. 212 (eliciting from Anwar Kearney that when Tarik Shah was causing trouble at the mosque, Dr. Sabir was not present). And during Dr. Sabir's own testimony, he repeatedly emphasized the differences between himself and Tarik Shah, stating that he never talked to Tarik Shah about al Qaeda, or about meeting an al Qaeda recruiter, or about providing support to al Qaeda (Tr. 1618, 1639), that he didn't even understand the bulk of the conversation between Tarik Shah and Ali, the undercover agent (Tr. 1483), and agreeing with his defense counsel's depiction of Tarik Shah as a "greedy, despicable man" (Tr. 1673).

Given this posture by the defense, it cannot have harmed Dr. Sabir that a juror or jurors learned that Tarik Shah may have pleaded guilty to "something," because Dr. Sabir's very defense included as a major component that, indeed, Tarik Shah was guilty (*see* Tr. at 2406 ("Tarik Shah is guilty")), but that Dr. Sabir was a different person in a different position and must be evaluated as such. After all, given the volume of recorded evidence in which Tarik Shah explains at great length what it is that he wished and planned to do to assist al Qaeda in its terrorist mission, it cannot be seriously argued that the news that Tarik Shah may have pleaded guilty to something would have had any impact on a reasonable juror's view of Tarik Shah, much less that this fact would have affected a juror's view of Dr. Sabir.

██ Second, the steps taken by the Court would have cured any potential prejudice that could have attached from the jury's learning the extra-record information at issue. The Court immediately attempted to (1) learn exactly what information had been imparted; (2) ensure that Juror # 8 could follow the Court's instructions to decide the case based only on the evidence from the trial and that persons not on trial were not at issue and could not play any role in her deliberations; and (3) ensure that the rest of the jury, including all of those who may have heard the information uncovered by Juror # 8, could also follow these instructions.[8] A hypothetical juror would reasonably be assumed to follow these instructions and continue his or her fair deliberations.[9]

██ Third, the presumed prejudice to Dr. Sabir from the amount of time it took

---

7. Thus, Dr. Sabir's statement in his present motion that there had been "absolutely no indication whatsoever from the defense as to any outcome of the judicial proceedings against Tarik Shah," (Tr. 2687) is not entirely accurate.

8. In this case, unlike in most of the cases cited by Dr. Sabir in which the district court received only a post-trial allegation of the injection of extra-record information (*see* Mem. at 14–15), the Court and the parties had the benefit of learning about what Juror # 8 had done during deliberations, before a verdict was reached. Thus, the Court was able to make an inquiry that properly explored what information had been imparted and, perhaps more importantly, to instruct the jury again about its duty to decide the case based only on the evidence, while protecting the jury's deliberative process.

9. It is well-settled that jurors are presumed to follow the Court's instructions to them. *See, e.g., Britt v. Garcia,* 457 F.3d 264, 272 (2d Cir.2006).

the jury to reach its verdict after disclosure to the Court and the parties of the extra-record information is belied by two key facts. The verdict was reached almost six hours after the disclosure. (Tr. 2681, 2741). In addition, the jury was deadlocked on one of the counts after the disclosure. This required the Court to give the jury the *Allen* charge.[10] Finally, the strength of the evidence against Dr. Sabir further supports the Court's conclusion that it was proper to not excuse Juror # 8 and continue to verdict in this case. As discussed *supra* at note 1, the Court rejected Dr. Sabir's motion for acquittal at the close of the evidence for this very reason.[11]

### CONCLUSION

For the reasons set forth above, Dr. Sabir's motions for a judgment of acquittal or a new trial [dkt. nos. 158 & 159] are denied.

SO ORDERED.

---

**10.** The Court of Appeals "has approved language directing jurors to consider the views of other jurors without abandoning their own conscientious opinions." *United States v. Henry*, 325 F.3d 93, 106–08 (2d Cir.2003) (citing *United States v. Melendez*, 60 F.3d 41, 52 (2d Cir.1995), *vacated on other grounds by Colon v. United States*, 516 U.S. 1105, 116 S.Ct. 900, 133 L.Ed.2d 834 (1996)).

**11.** To the extent that Dr. Sabir suggests that the Court should hold a post-trial hearing to delve into which jurors heard what (*see* Mem. at 14), such a hearing would be unauthorized on this record and, in any case, ineffectual. The Court may not inquire into the effect of learning of Tarik Shah's guilty plea upon the jury's deliberations, *see Greer*, 285 F.3d at 173 (quoting *United States v. Calbas*, 821 F.2d

887, 897 (2d Cir.1987)), and the parties and the Court already know, from the examination of Juror # 8 and the instructions given to her and the rest of the jury, everything they are entitled to know: namely, the "extraneous" information that was put before the jury. Accordingly, such a post-trial would only result in improper scrutiny of the jury's deliberations. *See United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir.1989) (observing that such post-verdict hearings "should be avoided whenever possible" and must only be held "when a party comes forward with clear, strong, substantial and incontrovertible evidence ... that a specific, non-speculative impropriety has occurred") (internal quotations and citation omitted).