**NATIONWIDE MUTUAL FIRE INSUR-ANCE COMPANY; Guy J. Staley; Norma Staley, Plaintiffs–Appellants,**

v.

**FORD MOTOR COMPANY, Defendant–Appellee.**

No. 97–3548.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 15, 1998.

Decided April 22, 1999.

Anthony J. Damelio (argued and briefed), Stephen M. Bales (briefed), Ziegler, Metzger & Miller, Cleveland, Ohio, for Appellants.

James W. Wiggin, III (argued and briefed), Lisa A. Lomax (briefed), Ted T. Martin (briefed), Thompson, Hine & Flory, Cincinnati, Ohio, for Appellee.

Before: GUY, RYAN, and CLAY, Circuit Judges.

RYAN, Circuit Judge.

The plaintiffs in this products liability diversity action, Nationwide Mutual Fire Insurance Company and its insured, Guy and Norma Staley, appeal from a jury verdict in favor of the defendant, Ford Motor Company. We are called upon to decide two issues: (1) whether the district court improperly excluded expert testimony based on a finding that Nationwide had spoiled evidence; and (2) whether judicial misconduct tainted the proceedings, thereby preventing Nationwide from receiving a fair trial. We answer both questions in the affirmative and accordingly we vacate the jury's verdict and remand for a new trial.

## I.

One day after the Staleys' son delivered a new 1994 Lincoln Town Car to the Staleys' garage while they were vacationing, a fire started, apparently in the garage attached to the Staleys' house, causing significant damage to the garage and the house. After the fire was extinguished, the Fire Marshall inspected the scene and opined that a faulty garage door opener was a possible cause of the fire.

Nationwide provided fire insurance coverage on the premises. Its expert, Richard Casto, arrived on the scene three days after the fire, by which time the damaged garage had been boarded up. Casto took photographs and he cleared debris off the Lincoln which remained in the garage, but did not take any measurements. Apparently, a videotape was taken of the scene on this visit, but the tape has never been found. Casto thought the fire began in the Lincoln. Nationwide's second expert, Ralph Dolence, went to the scene one day after Casto; he took photographs and focused his attention on the electrical wiring in the car. He believed the fire was probably caused by the electrical wiring but he was not able to pinpoint a defect. That same day, Nationwide contacted the Lincoln Mercury dealership from which the

car had been purchased to inform the dealership that Nationwide believed the Lincoln might have been the source of the fire and to invite someone from Ford to inspect the vehicle.

The following day—now five days after the fire—because clean-up efforts were set to begin at the Staley residence, Nationwide removed the car to another indoor location for safekeeping. Ford was not notified that Nationwide was moving the car. Finally, two days later—now a week after the fire—Nationwide told Ford where the car was located and that repairs to the Staley residence would begin in six days. Ford then sent a photographer to the residence and then to the indoor facility where the car was being stored.

Approximately two months later, Nationwide sent another expert, Ken Berchak, to inspect the Lincoln. He discovered an apparent short in an electrical wire harness, which he believed caused the fire, and he removed the wire harness for the purpose of preserving it. Ford was not notified of Berchak's inspection and removal of the wire harness.

After paying the Staleys under the terms of its policy, Nationwide sued Ford in subrogation, claiming that a design or manufacturing defect caused the fire in the Lincoln and, in turn, to the house and garage.

Before the case proceeded to trial, Ford moved to exclude the testimony of Nationwide's expert, Berchak, as a sanction for removing the electrical wire harness from the Lincoln—an act Ford characterized as "spoliation" of evidence at the fire scene. The district court granted Ford's motion, agreeing that the removal of the wire harness amounted to spoliation. The court stated that by removing the car from the garage, and the wire harness from the car, Nationwide denied Ford an opportunity to develop information favorable to its defense. Although Ford asked that all testimony by the expert be excluded, the court stated that Berchak would be permitted to testify regarding his conclusion that a de-

fect caused the fire as long as he based his opinion on evidence which Ford had the opportunity to inspect, "such as burn patterns on the vehicle."

During trial, before Berchak testified, Ford moved once again to exclude Berchak's testimony, arguing that under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), Berchak had not established a sufficient basis upon which to form an opinion regarding the cause of the fire or the manufacturing defect. The court overruled Ford's objection and allowed Berchak to testify, but forbad any reference to the wire harness.

Once Berchak began to testify regarding his opinion that a manufacturing defect caused the fire, Ford again renewed its previous objection. This led to a side-bar conference, the transcript of which reveals much confusion on the part of the trial judge as to the scope of the evidence to which Berchak would be allowed to testify. The court allowed Berchak to resume his testimony, only to interrupt the witness, claiming the testimony was repetitious. The court then disallowed the testimony and refused to permit plaintiffs' counsel to approach the bench for another side-bar conference. After a recess and a proffer of evidence by plaintiffs' counsel, the court once again agreed to let Berchak testify, but again interrupted the testimony, claiming it was repetitive. As we have said, the jury's verdict was for the defendant.

## II.

### A.

Nationwide argues that the district court not only erred in excluding Berchak's opinion testimony, but compounded the error when it violated its own order by not allowing Berchak to testify as to matters to which the court had already agreed Berchak could testify. Because we find that the court erred in excluding the expert testimony, it is not necessary to de-

cide whether the court's subsequent contradictory rulings amounted to additional error.

Nationwide contends that the court erred in ruling that Nationwide's investigation "spoiled" the wire harness by removing it from the vehicle. The evidence was not destroyed, Nationwide argues, but merely removed from the damaged vehicle in order to preserve it for further inspection by Ford and for use at trial. Nationwide argues that its removal of the wire harness did not prejudice Ford because Ford had two months to inspect the harness before it was removed from the car and had further opportunity to inspect the wire harness once it was removed, but did not ask to do so. Nationwide also argues that, in all events, it did not remove the wire harness in bad faith, and therefore, it should not have been sanctioned for its removal.

Ford responds that the wire harness was effectively "spoiled" as useful evidence when it was separated from the Lincoln's frame or chassis and related electrical system to which it was connected. That is particularly so, Ford argues, since apparently Nationwide's claim is that the harness caused the fire because of the manner in which it was installed on the vehicle. Ford also argues that it did not have an adequate opportunity to inspect the wire harness because it was not aware that Nationwide considered the wiring to be a defect until it was already removed. In other words, Ford argues, it could not possibly know what to inspect without knowing which component of the car Nationwide was claiming to be defective.

■ We review a district court's decision to exclude testimony for an abuse of discretion. *See Zamlen v. City of Cleveland,* 906 F.2d 209, 215 (6th Cir.1990). The rules that apply to the spoiling of evidence and the range of appropriate sanctions are defined by state law; in this case, Ohio. *See Welsh v. United States,* 844 F.2d 1239, 1245 (6th Cir.1988).

■ A court may exclude expert testimony as a sanction for spoiling evidence if it determines that the evidence has been intentionally altered or destroyed by a party or its expert before the defense had an opportunity to examine the evidence. *See Cincinnati Ins. Co. v. General Motors Corp.,* 1994 WL 590566, at *3 (Ohio 1994). If a threshold showing of spoliation is made, the burden then shifts to the proponent of the evidence to prove that the other side was not prejudiced by the alteration or destruction of the evidence. The test for prejudice is whether there is a reasonable possibility, based on concrete evidence, that access to the evidence which was destroyed or altered, and which was not otherwise obtainable, would produce evidence favorable to the objecting party. *See Bright v. Ford Motor Co.,* 63 Ohio App.3d 256, 578 N.E.2d 547, 550 (Ohio 1990).

■ It is not disputed that the wire harness was not destroyed. Nationwide determined that in the circumstances, removing the wire harness was necessary for further close inspection and preservation in case of litigation. Whether Ford, or the district court, or this court for that matter, would or would not have removed the harness is not the test for determining whether evidence has been spoiled. Rather the test, under Ohio law, is whether Nationwide intentionally altered or destroyed its evidence, causing prejudice to Ford. There is no evidence in the record to suggest that Nationwide intentionally altered or destroyed the evidence before Ford had an opportunity to inspect it, either before the harness was removed from the car, or thereafter. "Intentional" here, of course, does not mean merely that the act of removal was knowing and willful, but rather that the harness was removed for the purpose of rendering it inaccessible or useless to the defendant in preparing its case; that is, spoiling it.

Ford had two months in which to inspect the wiring of the car before the harness was removed. In addition, there was no

evidence before the court that the removal of the wire harness prejudiced Ford. For one thing, Ford never asked to inspect the harness. Moreover, Ford was still able to establish a defense in this case; as a matter of fact, Ford's theory was that the fire was caused by a faulty garage door opener.

We think the district court abused its discretion, first in determining that Nationwide's removal of the wire harness from the vehicle, for purposes of inspection and preservation, two months after Ford had notice of the fire damage to the vehicle, amounted to spoliation of the evidence, and second in excluding the witness Berchak's opinion testimony. We do not think Ohio appellate courts would find that what was done here was spoliation of evidence.

### B.

■ Plaintiffs also claim they were denied a fair trial because of the trial judge's frequent interruptions, cross-examinations of witnesses, and suggestions to defense counsel to object. These activities, according to Nationwide, tainted the trial, influenced the jury, and precluded Nationwide from receiving a fair trial. We review a district judge's conduct during a trial for an abuse of discretion. *See Cox v. Treadway,* 75 F.3d 230, 237 (6th Cir.1996).

■ We have stated before that the judge is the "governor of the trial" for the purpose of assuring that the trial runs smoothly and that the judge is free to ask questions for the purpose of clarifying the testimony and to elicit the truth. *See United States v. Hickman,* 592 F.2d 931, 933 (6th Cir.1979). However, the judge must always remain " 'calmly judicial, dispassionate and impartial. He should sedulously avoid all appearances of advocacy as to those questions which are ultimately to be submitted to the jury.' " *Id.* (citation omitted). Furthermore, as we pointed out in *Hickman,* the judge's impartiality before the jury is critical because the judge's every action is likely to have a great influence on the jury. *See id.* It is against this backdrop that we review some of the trial court's conduct during the trial.

■ Judge Kinneary interrupted plaintiffs' opening statement six times. In two of these interruptions, the judge cut plaintiffs' counsel short, telling him that it was not necessary to go into so much detail about what evidence would be presented. When, during his opening, plaintiffs' counsel mentioned that two of the insurance company's adjusters would be testifying, the judge interrupted and called a bench conference. There, he admonished plaintiffs' counsel for planning to call these witnesses in his case in chief and said they should be called only as rebuttal witnesses, if necessary. Twice more, the judge interrupted plaintiffs' counsel's opening statement with questions, and finally, he interrupted with the question: "This was after the car had been removed from the garage, wasn't it?" On the other hand, Judge Kinneary interrupted defense counsel once. Interrupting an opening statement was one of the factors in *Hickman* that led us to the conclusion that the defendant in that case was denied a fair trial.

Judge Kinneary also engaged in significant interruptions and cross-examinations of Nationwide's witnesses. The judge questioned Nationwide's witness, Randy Howell, regarding a matter unrelated to the scope of the direct examination and then interrupted the direct examination of Nationwide's witness, Ralph Dolence, and questioned the witness extensively. When Nationwide's counsel began to question the witness regarding the origin of the fire, the following colloquy occurred:

> Q. Mr. Dolence, when you arrived on the fire scene—
>
> THE COURT: Just a minute. Were you advised before you arrived on the scene as to the origin—place of origin of the fire?
>
> THE WITNESS: No, sir.

THE COURT: Were you coached in any way? Were you informed in any way?

THE WITNESS: No, sir, I was not.

THE COURT: This was completely new to you?

THE WITNESS: Yes, sir.

THE COURT: All right. Do you want to change your question?

MR. DAMELIO: Your Honor—

THE COURT: You talk about the origin of the fire. This man didn't know where the origin of the fire was unless he was informed by Casto or somebody else.

MR. DAMELIO: Your Honor, with all due respect, may I continue?

THE COURT: Don't—Leave the respect out of it. Go ahead.

The next interruption and interrogation by the court occurred when Nationwide's attorney was questioning the witness Dolence regarding his preservation of the evidence at the scene. Dolence testified that he removed the garage door opener from the front lawn and took it into his custody. The following interrogation took place:

THE COURT: Why did you do that?

THE WITNESS: Sir, there were others—

THE COURT: Let me ask you, you were there before any representative of the Ford Motor Company was there, weren't you?

THE WITNESS: Yes, sir, that is correct.

THE COURT: And knowing that, you took the garage door opener?

THE WITNESS: Sir, the garage door opener was on the front lawn. It had been removed by the fire department during fire suppression activities.

THE COURT: Where did you take it? Back to your office?

THE WITNESS: Yes, sir.

THE COURT: Why did you do that?

THE WITNESS: To preserve it for anyone to have the ability to examine or test it.

THE COURT: Why didn't you preserve it at the scene?

THE WITNESS: It was laying in the front yard.

THE COURT: Well, you could have put it in the garage, couldn't you? Why did you have to take it back up north to your office?

THE WITNESS: To put it in safe-keeping in the evidence building.

THE COURT: You don't think it would be in safekeeping in the garage?

THE WITNESS: No, sir. There were board-up people and construction people there the day that I was there.

THE COURT: All right. Go ahead.

At another point in Dolence's testimony, the judge admonished him for not being short enough in his answers.

Finally, Dolence was once again chastised by the judge for taking the garage door opener back to his office. The following exchange occurred:

Q. What specifically about your examination of the garage door opener led you to that conclusion?

THE COURT: This is what he saw on the lawn?

THE WITNESS: Yes, that is the lawn.

THE COURT: That he took back to his office?

MR. DAMELIO: Yes, sir, to preserve the integrity of that.

THE COURT: The Court doesn't accept that. That is properly preserved at the scene of the fire.

MR. DAMELIO: May I ask the witness, Your Honor, why he took it back to his office?

THE COURT: No, you may not.

ZL

THE COURT: Why did you take a picture of the front lawn? Was the fire out there in the front lawn?

THE WITNESS: That is where the garage door opener was, sir.

THE COURT: The one you took back to your office?

THE WITNESS: Yes, sir.

THE COURT: All right. What relation does the front lawn have to this fire, sir?

THE WITNESS: That's where the debris was pulled out prior to my arrival there by the fire department, sir, and that's where the garage door opener is. The garage door itself is laying there, and the garage door opener is there.

THE COURT: How is this going to bear on whether or not this fire started in the automobile?

THE WITNESS: Sir, others had said that the garage door opener had caused this fire. It was my obligation as an investigator to preserve that evidence in my understanding, and that is why I—

THE COURT: That is why you took it home?

THE WITNESS: Yes, sir. So others could look at it, and it was in safekeeping. The contractors were there with dumpsters hauling debris away.

THE COURT: You didn't think it was in safe condition at the scene of the fire, did you?

THE WITNESS: Sir, there were contractors hauling the debris away while I was there. So, no—

The judge next interrogated Oliver Garrison, Nationwide's witness, concerning the removal of the car from the garage:

THE COURT: Did you order it removed?

THE WITNESS: Yes, sir, I did.

THE COURT: Why?

THE WITNESS: It was to preserve the evidence there in order that the other company, Ford Motor, could have an opportunity to—

THE COURT: Was Ford Motor Company aware of its involvement at the time you ordered the automobile removed?

THE WITNESS: I believe Ford Motor Company became aware of it probably on the 20th day of April. I'm not certain—

THE COURT: The fire occurred on the 15th of April.

THE WITNESS: That's correct.

THE COURT: You had people on the scene on the 18th of April and the 19th of April.

THE WITNESS: That's correct.

THE COURT: Do you know when Ford was advised about the fact of the fire and the involvement of the Town Car?

THE WITNESS: Ford was notified by Adjuster Barb Whitehouse, and a representative from Ford had inspected the automobile at Oak Hill Automotive—

THE COURT: That was after it was removed.

THE WITNESS: That's correct.

THE COURT: Why did you remove it?

THE WITNESS: I was attempting to preserve the evidence there at the scene and also—

THE COURT: Knowing that Ford was involved or could be involved and would probably want to see the Town Car in its position at the fire, why did you order it removed?

THE WITNESS: Well, I had contacted Nationwide large loss manager Jim Lazio, and at my direction I asked to have the vehicle removed in order—

THE COURT: I asked you why didn't you leave it there to give Ford an opportunity to inspect the scene just as Nationwide had inspected the scene?

THE WITNESS: With the situation I was aware that there was construction people coming in and restoration people to start work at the Staley residence.

THE COURT: Did the owners of the property ask you to remove the automobile?

THE WITNESS: I'm not certain, but I'm sure they were there, and they were aware.

THE COURT: You don't know whether they asked you or not, or do you?

THE WITNESS: I don't recall that. I asked to have the car removed.

We stated in *Hickman* that sometimes judicial intervention is necessary to clear up confusion in the evidence or to supplement, in an impartial fashion, the presentation of a poorly prepared attorney. The manner in which the judge interjects himself is also a factor; an indication of outright bias or belittling of counsel is ordinarily reversible error. *See Hickman*, 592 F.2d at 933. More common than outright bias, however, is the appearance of partiality that arises when a judge intervenes continually on the side of one of the parties. While Ford points out that the judge interrogated one of its witnesses, it is clear from the record that the judge's interruptions were overwhelmingly during Nationwide's direct examinations of its own witnesses and consistently derisive, in tone and content, of Nationwide's theory of the case. Whether Judge Kinneary was actually biased against Nationwide is irrelevant: His interruptions were so numerous and his questions so one sided, they must inevitably have left the jury with the impression that the judge believed Nationwide's actions were egregious and improper.

Nationwide also claims judicial misconduct based on the judge's frequent suggestions to Ford's counsel that he ought to register objections. Repeatedly during Berchak's testimony, Judge Kinneary asked Ford's counsel if he wished to object to the questioning. Frequently, Ford's counsel did not wish to object. At one point, Nationwide's counsel objected to the judge pointing to the defense counsel, and prompting him to object to Nationwide's questions. While the pointing obviously is not in the record, plaintiffs' counsel's statement describing the judge's conduct is. At one point counsel said, "Your Honor, I haven't even finished my question, and you're pointing to the defense counsel to object to my question." The judge also solicited objections by defense counsel during Dolence's and Guy Staley's testimony. We held in *Hickman* that soliciting objections from a party was one factor that led to a remand for judicial misconduct. *See id.* at 934, 936.

We have also stated that "the harmless error doctrine is inapplicable in cases where judicial bias and/or hostility is found to have been exhibited at any stage of a judicial proceeding." *Anderson v. Sheppard*, 856 F.2d 741, 746–47 (6th Cir.1988).

We have carefully examined the trial record and we can find no justification whatever for Judge Kinneary's constant interruption of the direct examination of the plaintiffs' witnesses and the intemperate tone and content of the court's often argumentative questions. There is no hint whatever that the court was provoked by any misconduct of counsel or by any want of ability on the part of Ford's counsel to try his own case. The district judge failed utterly to set an example of judicial temperament and impartiality and to permit plainly competent lawyers to proceed in the fashion they preferred.

It is clear from the record that the trial in this case was so infected with the appearance of partiality by the trial judge that a new trial is necessary. While we concede the possibility that some of the judge's interruptions may not have been caused by conscious bias against Nationwide, we are certain that the jury was led to the opposite conclusion. Accordingly, we must set aside the verdict against Nationwide and remand the case for a new trial.

We have, of course, considered requiring that the retrial be conducted by another judge, but we do not think it appropriate

that we burden another judge's docket because of error caused by Judge Kinneary. Consequently, we have chosen to leave to Judge Kinneary's discretion the question whether he conducts the retrial or recuses himself.

## III.

We **VACATE** the jury's verdict and **REMAND** for a new trial.