NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0423n.06

Case No. 12-2419

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

Jun 08, 2015

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| REGINALD MARCELLUS DANIELS, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| _____/ | ) | |

**Before: Merritt and White, Circuit Judges; Hood, District Judge.**[*]

**MERRITT, Circuit Judge.** A jury convicted Reginald Daniels of possessing a handgun with an obliterated serial number as a felon. He appeals his convictions, arguing that various errors or their cumulative effect made his trial fundamentally unfair. We vacate his convictions and remand to the district court for a new trial.

## Overview

Daniels was arrested in his mother's home and charged with being a felon in possession of a weapon with an obliterated serial number. He conceded most of the elements of the crimes other than his possession of the weapon at issue.

---

[*] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

Local police officers testified that they entered the house without a warrant but with permission after one of them looked through a front window and saw Daniels holding a handgun with an extended magazine. When they entered, Daniels approached them but was unarmed. He told the officers, in response to their questions, that he had recently been on parole for "shooting someone." After they confirmed that Daniels was a convicted felon, the officers arrested him and subsequently recovered a handgun with an extended magazine and an obliterated serial number from a basement room that would have been accessible to Daniels just before they entered.

On cross examination, the defense attempted to highlight inconsistencies between prosecution witnesses' trial testimony and contemporaneous police records. The district court severely limited this testimony, stating in the presence of the jury that it was not relevant to what the jury had to decide. The defense later produced its own witnesses who testified that Daniels was not holding the gun, that the blinds that always covered the front window would have made it impossible for the officers to see into the house as they claimed, and that the officers entered the home without consent.

The jurors were initially unable to reach a unanimous verdict, but after receiving additional instructions from the district court, they convicted Daniels on both counts.

## Analysis

While Daniels presents multiple issues on appeal, we focus on his complaints regarding the district court's treatment of defense counsel in front of the jury and erroneous supplemental jury instructions issued just before the jury returned a guilty verdict.

We turn first to Daniels's complaint about the district court's treatment of his counsel and his case in front of the jury. Daniels summarized this complaint about comments the district court made in front of the jury:

> [A]lthough the district court did not issue a contempt order against Daniels's counsel, it derided his conduct of the case, continually interrupted his questioning, calling it "flim-flam," harassing, and said that he was dancing like a preacher. And during closing argument it told Daniels's counsel to "shut up" and described his argument as mendacious.

Daniels Br. 13 (citing Tr. 139, 142–43, 154–56, 180–82, 210–11, 218–20). In evaluating whether the district court's statements undermined the fairness of Daniels's trial, we pay particular attention to comments made in front of the jury addressing the integrity of Daniels's attorney and witness credibility determinations entrusted to the jury.

When Daniels's attorney began challenging the testimony of the government's first witness, the court said:

> This dramatic, high voice, moving around, touching your client. It isn't going to happen. You went into a whole series of pretty dramatic questions about what happened, who opened the door, who pulled it open. *It had nothing, nothing to do with what this jury has got to decide* and you're getting back into some other areas. Now you are a very intelligent man and you know what I'm talking about and you know *you're going to be sanctioned if this continues* so don't let it continue.

Tr. 142–43 (emphasis added). When Daniels's attorney was questioning the officer who testified about recovering the pistol from the basement, the jury heard the district court say:

> I have some proposed jury instructions here, and I think I know what they're going to be asked to do and what the issues are in terms of the charges here, and all of this is irrelevant to start out with, and it's a little bit of flim flam too.

Tr. 299. When Daniels's attorney, Mr. Barnett, then asked the officer if he showed the gun to anyone in the house, the jury heard the following exchange:

> THE COURT: All right. Mr. Barnett, you're not listening to me.
> MR. BARNETT: I'm not?

>THE COURT: It doesn't make any difference to what this jury has to decide, and I'm not going to let you continue to waste our time and the jury's time. There's no question that there's been testimony about a gun. There's no question to what the jury has [got] to decide with regard to felon in possession of a weapon. It has to do with what possession is and whether there was any of it. This doesn't have anything to do with it. Whether this officer picked up the gun, went outside and showed it to other people has nothing to do with what the jury has to decide here and we're going to stop it right now.
>MR. BARNETT: May I, your Honor? We argue it has something to do with our case, and I can explain to you why, if you allow me a minute.
>THE COURT: I've given you a lot of latitude and I don't need any[ ]more explanation. I need you to stop doing what you're doing.
>MR. BARNETT: I just finished, your Honor, no further questions.

Tr. 300–01. That concluded the trial testimony. During closing arguments, the jury heard the district court order Daniels's attorney to "shut up." It also heard the district court describe the defense theory that the police officers had reason to lie as "over the top . . . mendacity." Tr. 327.

"An indication by the trial court of 'outright bias or belittling of counsel is ordinarily reversible error,' and it is also reversible error if the trial 'was so infected with the appearance of partiality' that the trial court's interjections must 'inevitably have left the jury' improperly influenced." *McMillan v. Castro*, 405 F.3d 405, 409–10 (6th Cir. 2005) (quoting *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 808 (6th Cir. 1999)). The district court in this case frequently belittled Daniels's counsel in front of the jury by threatening sanctions, accusing him of "flim flam" and "mendacity," and ordering him to "shut up." These remarks began with the first witness and continued through to closing arguments. Some influence on the jury seems inevitable. The district court told counsel and the jury that the issues of credibility he was pursuing were "irrelevant" and had "nothing to do with what the jury ha[d] to decide." While any of these statements (or the several others cited by Daniels) might have been harmless

during sidebars addressing government objections, allowing the jury to hear these numerous *sua sponte* statements created an appearance of bias that undermines the verdict.

After the trial, the jury was hung. The district court issued supplemental instructions encouraging further deliberation when the jury was unable to reach a unanimous verdict after five hours. Following those instructions, one juror posed a question about reasonable doubt:

> Can we ask you a question? Can we ask a question? I think where we're getting stuck is how much doubt is reasonable? I know that's kind of an open ended, vague question, but that's where —

Tr. 368.

The district court declined to "read all the instructions over again," and instead improvised a reasonable doubt instruction that included the following:

> [R]easonable doubt is something short of absolute certainty by some measurable distance. It means that if you have reasonable doubt, that *there is no way a reasonable person can come to the conclusion that you need to come to*, to in this case find the Defendant guilty of two charges.

*Id.* (emphasis added). The defense objected as soon as the jury was dismissed for lunch and further deliberations, but the district court declined to call the jury back to reread the pattern instructions or explain the meaning of "no way a reasonable person can" convict. Reasonable doubt is a difficult standard to quantify, but it attaches well before "there is no way a reasonable person can come to the conclusion" that a defendant is guilty. In the context of a trial with competing factual testimony, a credibility-oriented defense, and a juror reporting that reasonable doubt was a sticking point for the jury, Daniels was entitled to an accurate instruction.

## Conclusion

This trial was ultimately about whether each juror believed the officers' testimony placing the gun in Daniels's hand and whether any lingering doubts about that testimony were

reasonable. A juror with full faith in the officers' credibility could have voted to convict Daniels on that testimony alone. To the extent that counsel was prevented from fully challenging the officers' credibility about their entry and the gun, Daniels did not receive a fair trial. Likewise, if comments from the district court about defense counsel or the defense theory led the jury to discount doubts about the officers' credibility, the jury's verdict might have been affected. Finally, if jurors believed that reasonable doubt requires there be "no way a reasonable person can come to the conclusion that you need to come to" to find Daniels guilty, their confusion would have impermissibly reduced the standard of proof we demand in criminal prosecutions.

On these facts, we cannot be confident that the verdict reflects an unbiased weighing of the evidence against a proper reasonable doubt standard. While Daniels invites us to reassign this case, we find that the circumstances here do not justify that extraordinary exercise of our supervisory authority. We do not know why these problems occurred,[1] but we have no reason to believe they will recur in the courtroom of this experienced and fair-minded judge. For these reasons, we vacate the convictions entered by the district court and remand the case to the district court for retrial.

---

[1] The fact that there was no pretrial evidentiary hearing on the motion to suppress undoubtedly contributed to the situation.