NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0440n.06

No. 17-1450

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>UNITED STATES OF AMERICA,</td><td>)</td><td rowspan="11"></td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Plaintiff-Appellee,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>v.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>TOMMY LEE JONES,</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>Defendant-Appellant.</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

**FILED**
Aug 24, 2018
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE:     BOGGS, CLAY, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge.  Tommy Lee Jones was convicted of advertising, distribution, and receipt of child pornography in violation of 18 U.S.C. §§ 2251(d) and 2252A(a)(2), and he was sentenced to 660 months' imprisonment.  Jones now challenges both his convictions and sentence.  Jones asserts that a new trial is necessary because the district court judge's comments and conduct during the trial denied him his right to a fair trial.  But while the district court judge's conduct was not model judicial behavior, Jones was not denied his right to a fair trial.  Jones's other challenges to his convictions similarly do not warrant a new trial.  Jones is correct, however, that it is necessary to remand the case for resentencing.  The district court enhanced Jones's sentence under USSG § 2G2.2(b)(5) based, in part, on Jones's sexual relationship with his stepdaughter that began when she was sixteen years old, but, as the government conceded at oral argument, that relationship does not qualify as an instance of "sexual abuse or exploitation" under

USSG § 2G2.2. Moreover, the district court failed to explain its decision to adopt the government's recommendation that "Vicky," a known victim of child pornography whose images were among those discovered on Jones's computer, be awarded $10,000 in restitution pursuant to 18 U.S.C. § 2259 and *Paroline v. United States*, 572 U.S. 434 (2014).

I.

In October 2015, FBI Agent Raymond Nichols conducted an investigation to identify persons using Ares—an internet-based, peer-to-peer file-sharing program—to share child pornography. Using a law enforcement version of Ares, Nichols identified 24 files—all of which were being shared by a single computer—with file names or "hash values"[1] known to be associated with child pornography. Nichols took screenshots of the suspected child pornography, downloaded all or part of the 24 files, and saved the files to a disk for further review. The files were determined to constitute child pornography. Upon further investigation, the FBI traced the files to an IP address belonging to Tommy Lee Jones, who worked for the internet service provider WOW! in Dearborn, Michigan. The agents learned that in 1991 a then-twenty-year-old Jones had pleaded guilty to unlawfully attempting to engage in sexual conduct with his eight-year-old sister.

On October 23, the FBI executed a search warrant at Jones's home. Jones and his twenty-one-year-old stepdaughter, Corrtney Jennings, were the only people at home at the time of the search. While searching the basement, where Jones and Jennings shared a bedroom, agents discovered an ASUS laptop containing more than 20 video files depicting children engaged in sexual activity, including files matching those Agent Nichols had identified during his online investigation. The files had been saved to a "share" folder on the laptop's desktop, and a forensic examination of the laptop showed that the Ares program was set up so that other Ares users could

---

[1] "Hash values" are the "electronic DNA" of a file; investigators maintain a database of hash values of known images and videos of child pornography.

download files from the "share" folder, but they could not add things to the folder or access other parts of the laptop's hard drive.

Although the agents informed Jones and Jennings that they could leave while the search was being conducted, they both chose to stay. Agent Nichols and FBI Agent Lauren Williamson interviewed Jones at the scene. According to Agents Nichols and Williamson, Jones admitted that the ASUS laptop was his main computer, and he explained that his home had password-protected Internet connections, both wired and wireless. Jones also admitted using Ares to download child pornography, but he estimated that he had done so "less than 100" times.

Jones was not arrested immediately. Instead, the agents asked whether he would be willing to go to the FBI office for further questioning, and he agreed. At the FBI office, Jones waived his *Miranda* rights and agreed to be interviewed by FBI Agent Michael Fitzgerald. During the interview, Jones confirmed that he had pleaded guilty in 1991 to a sexual offense involving a young family member, and he again admitted using Ares to download child pornography. Jones also disclosed that he and Jennings had a sexual relationship—beginning when she was sixteen— and that she was pregnant with his child.

Jones was indicted on five counts related to the production (count I), advertising (count II), distribution (count III), receipt (count IV), and possession (count V) of child pornography. The government later voluntarily dismissed count I, and Jones proceeded to trial on the four remaining counts.

The government called four witnesses at trial: Agent Nichols, Agent Williamson, Agent Fitzgerald, and FBI Agent Adam Christensen, who had seized the ASUS laptop during the search. In addition to the videos found on the laptop, the government also presented forensic evidence that Agent Nichols had pulled from the Ares software. The Ares download log revealed that hundreds

of other files with names consistent with child pornography had been accessed through the Ares program, and numerous search terms associated with child pornography had been typed into the Ares search engine from the laptop, *e.g.*, "PTHC" (pre-teen hard core), "PTHC brutal," "pedo," etc.

Jones conceded that the government's exhibits were child pornography, but he claimed that someone in his neighborhood had downloaded the files to his computer without his knowledge after he installed an "internet extender" that gave his neighbors access to his wifi network. Jones's son, Tommy Jones III, and Jennings both testified that Jones had an "open" wifi network, and they asserted that anyone within range of the network could store files on Jones's computer without his knowledge. Jennings also testified that the ASUS laptop belonged to her and that she had downloaded the Ares software so that she could search for popular movies.

Jones also testified that his wifi network and computer were "open." He contradicted Agent Nichols' testimony regarding their conversation during the search, claiming that he had told the agents that he had multiple wifi connections, some password-protected and some not. He also claimed that he had never downloaded child pornography, or "[i]f I did, it was by accident." Finally, Jones admitted making the statements attributed to him by Agent Fitzgerald, but he claimed that he had agreed to say whatever Agent Fitzgerald wanted because he was "scared" and "tired."

Jones was convicted of counts II–V, but because count V (possession) was based on the same images that formed the basis of count IV (receipt), count V was dismissed pursuant to *United States v. Ehle*, 640 F.3d 689, 693 (6th Cir. 2011). Jones was then sentenced to 660 months' imprisonment—300 months on count II (advertising), 180 months on count III (distribution), and 180 months on count IV (receipt), all to run consecutively. Jones was also ordered to pay $10,000

in restitution to Carol L. Hepburn in trust for "Vicky," a victim in three of the child pornography videos found on Jones's computer.

Jones appeals. While his challenges to his convictions are without merit, the district court did err in crafting Jones's sentence, and it also did not adequately explain its adoption of the government's restitution proposal.

## II.

Jones first argues that the district court's comments towards defense counsel and interjections during the trial denied him his right to a fair trial. But while the district court's conduct fell short of model judicial behavior, a review of the entire record indicates that Jones received a fair trial, and the district court's conduct was not an abuse of discretion. Most of the comments, read in context, amounted to inartful attempts by the district court to promote trial efficiency and to ensure that defense counsel focused on relevant issues. Accordingly, the district court's conduct did not fall so demonstrably outside the acceptable range of judicial behavior such that it amounted to hostility or bias toward Jones.

Jones complains primarily about the district court's comments and interjections during defense counsel's cross-examination of Agent Nichols. On three occasions the district court *sua sponte* admonished defense counsel that his questions were not relevant to the issues that the jury had to decide or that he was "wasting the jury's time." The district court made three more similar comments to defense counsel while resolving government objections.

We have previously found that such comments do not necessarily amount to reversible error. *See United States v. Powers*, 500 F.3d 500, 511–14 (6th Cir. 2007). In *Powers*, the same presiding district judge made twenty-six comments like the ones cited by Jones—*e.g.*, "All right. This is not helping the jury. Go onto something else," "Let's go onto something else. This is

wasting the jury's time," "I think that we're pretty much at the end of my tether on this kind of cross-examination," *id.* at 505, n. 5—and we concluded that "[t]he conduct to which Defendant objects falls within the range of 'acceptable, though not necessarily model, judicial behavior.'" *Id.* at 513 (citation omitted). Moreover, the trial transcript here demonstrates that defense counsel did tend to ask confusing or irrelevant questions, and a trial judge "may interject himself into the trial, speak to counsel, and question witnesses in order to clear up confusion regarding evidence or aid in its orderly presentation." *Id.* at 511 (citing *McMillan v. Castro*, 405 F.3d 405, 410 (6th Cir. 2005)). For example, the district court's first *sua sponte* interjection came after defense counsel engaged in a lengthy and confusing line of questioning about the technical mechanics of the law enforcement version of Ares.

Some of the district court's other admonitions came after defense counsel attempted to elicit testimony about a photograph that the court had already ruled was irrelevant and inadmissible. The photograph, which had formed the basis for dismissed count I (production of child pornography), depicted a young woman performing oral sex on an unidentified man. Agent Nichols had testified to the grand jury that Jennings was the woman in the photo, which Jones disputed, but after the government voluntarily dismissed count I, the district court concluded that the photo was not relevant to the remaining charges. However, while cross-examining Agent Nichols, defense counsel attempted to bring Jennings into the courtroom to demonstrate that Agent Nichols had misidentified her as the woman in the photo. When the government objected on relevance grounds, the court expressed frustration, stating, "It's very hard, in some cases impossible, for this judge to understand what you're eliciting in testimony and why it has anything to do with this case." It is true that the district court could have been more restrained, but the court

reasonably sought to avoid a dramatic sideshow, and trial judges have "discretion to move defense counsel along from a repetitive and irrelevant line of questioning." *Powers*, 500 F.3d at 512.

During the defense's case, the district court did not interrupt defense counsel, although Jones cites two exchanges between defense counsel and the court as evidence of judicial misconduct. First, the district court allowed defense counsel to call Jones's sister-in-law, Keara Jones, to testify over the government's objections, but defense counsel then attempted to elicit testimony that Keara was the woman in the photograph that had formed the basis of dismissed count I, even though the court had repeatedly advised defense counsel that the photo was out of bounds. The government objected, citing the court's previously rulings that the photo was out of bounds, and the court admonished defense counsel: "I believe that you should know by now what we're talking about, and we have come to the conclusion that it will not be admitted . . . . This witness is not going anywhere and is done, unless you have something else." Again, district courts have the authority to enforce their evidentiary rulings and to curtail counsel from pursuing irrelevant testimony. Jones also cites the district court's comment during the government's cross-examination of Jones, that Jones was "overreaching like mad." But this comment came after the court had given Jones significant leeway during his testimony, and after the government requested that the court control the witness because Jones repeatedly provided rambling, narrative answers to government questioning. The court should have chosen its words more carefully, but it is within the district court's power to reasonably reprimand unruly witnesses and ensure orderly presentation of evidence and testimony.

There are, however, two comments that the district court made in the presence of the jury that are troubling. First, when the district court warned defense counsel that he was cross-examining Agent Nichols about issues that were not relevant to the jury's decision, the district

court stated, "I think we're into that area, again, where [Agent Nichols] has been very knowledgeable and has been very forthcoming." Second, defense counsel sought to question Agent Nichols about photos taken by investigators during the search of Jones's home for the proffered reason that they would "lay out the scene" and fortify the defense's argument that Jones's confessions were made under duress. The court admitted the photos, but stated, "I don't know how those photographs will demonstrate anything concerning duress or being put in an intimidating position." The court, however, admitted that it had not seen the photos. The comments are troubling because "[t]he credibility of witnesses is exclusively the province of the jury," *United States v. Bond*, 22 F.3d 662, 667 (6th Cir. 1994), and the probative value of evidence is generally a question reserved to the jury. District courts should refrain from comments that appear to assess witness credibility or the probative value of evidence, and these comments come very close to judicial misconduct.

But here the judge gave extensive curative instructions. Before the trial even began, the district court instructed the jury that "nothing I say or do or do not say or do not do, and nothing in my facial expressions or the inflections in my voice during the course of the trial should influence your verdict. Remember . . . you are the judge of the facts." At the close of the trial, the court instructed the jurors about what evidence was appropriate for them to consider in reaching their decision, and it reiterated that "my comments and questions are not evidence." Further, the court explained to the jurors that part of their job was to decide how credible or believable each witness was: "This is your job, not mine." Finally, the court instructed the jury not to "interpret my rulings on [the parties' objections] as any indication of how I think the case should be decided." In assessing whether the district court's conduct fell so demonstrably outside the acceptable range of judicial behavior such that it amounted to hostility or bias, it is appropriate to consider whether

the district court gave curative instructions at the close of the proceedings. *McMillan*, 405 F.3d at 410 (citing *United States v. Tilton*, 714 F.2d 642, 645 (6th Cir. 1983)). These instructions helped reduce the problematic aspects of the court's earlier comments, and when the trial transcript is read in its totality, the court's comments did not deny Jones his right to a fair trial.

Ultimately, "[j]udicial misconduct is found where the judge's remarks 'clearly indicate a hostility to one of the parties, or an unwarranted prejudgment of the merits of the case, or an alignment on the part of the Court with one of the parties' . . . or where the judge, in exercising his discretion to interrogate witnesses, 'abandons his proper role and assumes [the role] of [an] advocate.'" *United States v. Blood*, 435 F.3d 612, 629 (6th Cir. 2006) (citations omitted) (second and third alterations in original). But that standard was not met here. Unlike cases where we have found judicial misconduct, *see, e.g.*, *United States v. Hickman*, 592 F.2d 931 (6th Cir. 1979) and *United States v. Daniels*, 616 F. App'x 782 (6th Cir. 2015), the district court did not take an anti-defendant tone, threaten defense counsel with sanctions, re-direct witnesses on behalf of the prosecution, accuse defense counsel of "flim-flam," or cut off defense counsel's closing argument. Instead, the district court's expressions of frustration and its interjections were imperfect attempts to run the trial in a focused and efficient manner, and the Supreme Court has instructed that "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display," do not establish bias or reversible error, *Liteky v. United States*, 510 U.S. 540, 555–56 (1994). While the district court's behavior falls within the range of acceptable judicial behavior, it bears repeating that district courts should "be mindful of their conduct in the presence of the jury and . . . take necessary precautions to prevent appearing partial to one side." *McMillan*, 405 F.3d at 412.

III.

Second, Jones challenges the district court's decision to excuse Juror 12 and replace her with an alternate prior to opening statements. After the jury was sworn in, but before opening statements, the district court received a note from Juror 12 indicating that she could not serve on the jury. Juror 12 explained that she was scheduled to leave the country for five days and that her travel plans conflicted with the court's proposed trial schedule. She also stated that she was a small-business owner and explained to the court that she "ha[d] a day full of clients scheduled" for one of the proposed trial dates and that "not being able to see [the clients] would cause a huge hardship on [her] business." It is unclear why Juror 12 did not raise these issues earlier, because the court explained the proposed trial schedule at the outset of jury selection and asked if any juror had "particular problems of personal, physical, or any other kind of problem that might affect [his or her] ability to sit as a juror." The government did not object to excusing Juror 12, but defense counsel objected, noting that Juror 12 was the only African American on the jury panel. The district court decided to delay its decision whether to excuse Juror 12 until the next morning, and after conferring with its scheduling coordinator, the court ultimately decided to excuse Juror 12. Defense counsel renewed his objection and suggested that the trial be delayed to accommodate the juror, but the court decided not to delay the trial and to proceed using an alternate.

The district court's decision to excuse Juror 12 was not an abuse of discretion, and Jones does not assert a violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). The district court may replace a juror if it has "reasonable cause." *United States v. Cantu*, 229 F.3d 544, 550 (6th Cir. 2000). "Good cause may encompass any of the 'inevitable vagaries of the many trial participants' complex lives,'" *United States v. De Oleo*, 697 F.3d 338, 342 (6th Cir. 2012) (quoting *United States v. Nelson*, 102 F.3d 1344, 1350 (4th Cir. 1996)), including a "planned business trip," *United*

*States v. Reese*, 33 F.3d 166, 173 (2d Cir. 1994); "sinus problems [that] [a]re a distraction to the proceedings" even though "the juror [i]s well enough to continue," *United States v. Puche*, 350 F.3d 1137, 1152 (11th Cir. 2003) (describing *United States v. Fajardo*, 787 F.2d 1523 (11th Cir. 1986)); or holiday travel plans, *Nelson*, 102 F.3d at 1349–50. Here, Juror 12's note made clear that her prearranged travel plans and business obligations conflicted with the proposed trial schedule. Thus, retaining Juror 12 would have required the court to either delay the trial, or start the trial on time but recess the proceedings while Juror 12 was out of the country. "A District Court has wide discretion in the scheduling of a trial which should not be disturbed in the absence of a manifest abuse," *United States v. Van Dyke*, 605 F.2d 222, 227 (6th Cir. 1979), and here, the district court did not manifestly abuse its discretion by seeking to maintain the trial's continuity and to avoid extended, unnecessary delays.

Moreover, Jones is entitled to a new trial only on a clear showing that he was prejudiced by the juror's being excused, s*ee United States v. Warren*, 973 F.2d 1304, 1308 (6th Cir. 1992), but Jones was not prejudiced. Jones argues that Juror 12's dismissal lacked factual support, but lack of factual support has nothing to do with prejudice, notwithstanding puzzling language in some cases from other circuits, *see, e.g.*, *United States v. Virgen-Moreno*, 265 F.3d 276, 287–88 (5th Cir. 2001); *United States v. De La Vega*, 913 F.2d 861, 869 (11th Cir. 1990). In any event, the district court clearly explained that it decided to dismiss Juror 12 based on the scheduling conflicts she raised in her note to the court.

At bottom, Jones's argument is that the district court erred by not corroborating or verifying Juror 12's proffered conflict with extraneous evidence or an independent investigation. But prior to excusing Juror 12, the court confirmed the juror's conflicts by questioning her about them on the record. Moreover, Juror 12's note made clear that she had significant scheduling conflicts, and

after the court conferred with its scheduling coordinator it confirmed that retaining Juror 12 would have resulted in unnecessary delays.

This was sufficient. Jones cites no authority requiring district courts to independently investigate a juror's proffered reason for her inability to serve. Indeed, "district judges are in the best position to view a juror's demeanor and determine whether she is able to shoulder the obligations of jury service," *De Oleo*, 697 F.3d at 342, and "[a]ll that is needed to satisfy a prudent exercise of discretion is to be certain the trial court had sufficient information to make an informed decision," *Reese*, 33 F.3d at 173. In *Reese*, the district court excused a juror after deliberations had begun because she informed the court that she had a pre-arranged business trip. *Id.* On appeal, the defendant complained that the court had abused its discretion by excusing the juror without examining her about the specifics of her trip, but the Second Circuit held that the district court had not abused its discretion. *Id.* Just as in *Reese,* nothing would have been gained by a hearing designed to explore the specifics of the juror's trip, and the district court's decision to excuse Juror 12 was not an abuse of discretion.

Jones, who is African American, also suggests that he was prejudiced because excusing Juror 12 meant that there were no African American jurors. According to Jones, "[h]aving an African American woman seated on the jury would have assisted thoughtful consideration" of his defense. While Jones's argument may be correct as a matter of trial strategy, his claim still fails. The Constitution does not give a criminal defendant the right to any particular racial composition of his or her petit jury, *see Taylor v. Louisiana*, 419 U.S. 522, 538 (1975); *see also Ambrose v. Booker*, 801 F.3d 567, 584 (6th Cir. 2015) (Polster, J., concurring in part and dissenting in part); *Teague v. Lane*, 820 F.2d 832, 843 (7th Cir. 1987), *aff'd*, 489 U.S. 288 (1989); *Cunningham v. Estelle*, 536 F.2d 82, 84 (5th Cir. 1976) (per curiam), and Jones was not entitled to maintain the

racial composition of the jury as it was selected, *United States v. Penn*, 870 F.3d 164, 168 (3d Cir. 2017); *see also United States v. Mendoza*, 510 F.3d 749, 754 (7th Cir. 2007). Thus, because Jones cannot demonstrate that he was prejudiced by the district court's decision to excuse Juror 12, a new trial is not warranted.

IV.

Third, Jones's challenges to the district court's evidentiary rulings are also unavailing. The district court did not abuse its discretion by admitting evidence regarding his 1991 conviction for unlawfully attempting to engage in sexual conduct with his then-eight-year-old sister. Such evidence fits squarely within Federal Rule of Evidence 414's exception to the general ban on propensity evidence, and the probative value of the evidence was not significantly outweighed by the danger of unfair prejudice, as required by Federal Rule of Evidence 403.

Under Rule 414, if a criminal defendant "is accused of child molestation, the court may admit evidence that the defendant committed any other child molestation." "Child molestation includes both conduct proscribed in Chapter 109A of Title 18, if committed against a child, and offenses involving child pornography." *United States v. Seymour*, 468 F.3d 378, 385 (6th Cir. 2006). The sponsors of the legislative amendment that introduced Rule 414 noted that such propensity evidence "is typically relevant and probative, and . . . its probative value is normally not outweighed by any risk of prejudice or other adverse effects." *United States v. Sumner*, 119 F.3d 658, 662 (8th Cir. 1997) (quoting 140 Cong. Rec. H8992 (daily ed. Aug. 21, 1994) (Statement of Rep. Molinari)); *see also*, *United States v. Larson*, 112 F.3d 600, 604 (2d Cir. 1997) (quoting 140 Cong. Rec. at S12990 (daily ed. Sept. 20, 1994) (Statement of Sen. Dole)). Indeed, Rule 414 reflects the "strong legislative judgment that evidence of prior sexual offenses should ordinarily be admissible." *United States v. LeCompte*, 131 F.3d 767, 769 (8th Cir. 1997). Here, Jones's prior

conviction for sexual misconduct with a minor was probative of his sexual interest in children and helped rebut his defense that his neighbors had downloaded child pornography to his computer without his knowledge. Indeed, the Eleventh Circuit recognized in *United States v. Woods*, 684 F.3d 1045 (11th Cir. 2012) (per curiam), that when a defendant alleges that the government cannot rule out others as the source of the child pornography on the defendant's computer, Rule 414 evidence can be probative of the defendant's interest in child pornography. *See id.* at 1065.

Jones relies on *United States v. Hough*, 385 F. App'x 535 (6th Cir. 2010), to argue that the danger of unfair prejudice outweighed the probative value of the Rule 414 evidence here, but his reliance is misplaced. In *Hough*, the government was appealing the district court's pretrial order *excluding* Rule 414 evidence, and thus the government had the burden to show that the district court abused its discretion. 385 F. App'x at 535–36. Here the burden is flipped. What is more, the Rule 414 evidence that the government sought to introduce in *Hough* included uncharged conduct that the government sought to prove by having three victims testify. *Id.* at 538. The court concluded that having additional testimony regarding uncharged conduct "would distract the jury from the evidence on the actual charges and could create unfair prejudice by inflaming the jury and possibly leading to a decision to convict Hough for his prior acts." *Id.* Here Jones confessed his prior conviction to investigators, and the prosecution sought to introduce evidence of Jones's prior conviction in the form of a copy of the prior charging document and judgment, and any stipulated facts from the prior conviction which were made part of the plea agreement in that case. Such evidence "eliminat[es] any risk of having the issue of prior conduct bloom into a trial within the trial, and reduc[es] the possibility that the admittedly prejudicial information [i]s inaccurate." *United States v. Majeroni*, 784 F.3d 72, 76 (1st Cir. 2015). Finally, the fact that Jones's prior conviction was more than twenty years old is not consequential, because Rule 414 has no time

limit, and the absence of a time limit was a deliberate choice. *United States v. Underwood*, 859 F.3d 386, 393 (6th Cir. 2017).

Ultimately, the Rule 403 balancing test requires a court to give "the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988). Accordingly, the district court did not abuse its discretion by admitting evidence of Jones's prior conviction under Rule 414. Here Jones's 1991 conviction had probative value to show his sexual interest in children, which was relevant to his motive and intent to knowingly receive child pornography. Moreover, it helped to rebut Jones's defense that others were responsible for the child pornography on his computer. The probative value of the evidence was not significantly outweighed by the risk of unfair prejudice.

The district court's decision to admit evidence of Jones's relationship with Jennings beginning when she was 16 years old is a closer call because such evidence does not fall within Rule 414's exception to Rule 404(b)'s general ban on propensity evidence. However, even if we assume that the district court erred by allowing the prosecution to introduce evidence that Jones and Jennings had a relationship before she was eighteen, the error was harmless. The Government presented overwhelming evidence against Jones.

Jones admitted that the ASUS laptop that contained numerous child pornography files was his "main computer." A forensic analysis of the laptop revealed that hundreds more files with names consistent with child pornography had been accessed using the Ares program, and search terms consistent with child pornography had been input into the Ares search engine from the laptop. Jones twice confessed that he had used Ares to download child pornography. The government properly introduced Jones's 1991 conviction to establish that he had a sexual interest in children to rebut his defense that any child pornography on his computer was either the work of

a neighbor or downloaded accidentally. *See supra.* Finally, Jones's defense that nearby neighbors had put child pornography on his computer without his knowledge using his open wifi-connection was thoroughly rebutted. A forensic examination of the laptop established that the folder containing child pornography was "a one-way street": other Ares users could download files from the "share folder," but they could not add files to the folder or access other parts of the laptop's hard drive. Moreover, Agent Nichols testified that when people are able to access a nearby wifi network, that does not give them access to other computers connected to the same network. Accordingly, any error in admitting evidence of Jones's relationship with Jennings was harmless, and a new trial is not necessary.

V.

Remand for resentencing is appropriate, however, because, as the government conceded at oral argument, the district court erroneously relied on Jones's relationship with Jennings when she was 16 years old to enhance Jones's sentence under USSG § 2G2.2(b)(5). Section 2G2.2(b)(5) provides for a five-level enhancement if a defendant has engaged in a "pattern of activity involving the sexual abuse or exploitation of a minor," *i.e.*, "any combination of two or more separate instances of sexual abuse or sexual exploitation of a minor . . . whether or not the abuse or exploitation (A) occurred during the course of the offense; (B) involved the same minor; or (C) resulted in a conviction for such conduct." *See* USSG § 2G2.2, comment 1. A minor is a person who is not yet 18 years old. *Id.* Further, the guidelines define "sexual abuse or exploitation" as

> (A) conduct described in 18 U.S.C. § 2241, § 2242, § 2243, § 2251(a)-(c), § 2251(d)(1)(B), § 2251A, § 2260(b), § 2421, § 2422, or § 2423; (B) an offense under state law, that would have been an offense under any such section if the offense had occurred within the special maritime or territorial jurisdiction of the United States; or (C) an attempt or conspiracy to commit any of the offenses under subdivisions (A) or (B). "Sexual abuse or exploitation" does not include possession, accessing with intent to view, receipt, or

> trafficking in material relating to the sexual abuse or exploitation of
> a minor.

*Id.* Here, the presentence report recommended an enhancement under § 2G2.2(b)(5) based on (1) Jones's "sexual relationship with his stepdaughter beginning when she was approximately 16 years old" and (2) Jones's "prior conviction for Gross Sexual Imposition of a child under the age of 13," and the district court explicitly adopted the presentence report's recommendations without further consideration or fact finding.

However, government counsel at oral argument declined to defend the district court's reliance on Jones's relationship with Jennings as an instance of "sexual abuse or exploitation." Instead, the government contends that the district court could have relied on other proofs in the record to enhance Jones's sentence under § 2G2.2(b)(5). But the alternative theories for enhancement under § 2G2.2(b)(5) that the government argues on appeal are better reserved for the district court on remand, because they involve questions of fact that the district court clearly did not resolve during the initial sentencing hearing.

For example, the government points to the charging documents for Jones's 1991 conviction, which state an offense date of January 11, 1990, to August 23, 1990, and argues that the district court could have inferred that Jones abused his sister multiple times over the eight-month period. But, as previously discussed, the district court relied exclusively on the factual findings in the presentence report, and nothing in the report indicates that Jones's prior conviction involved multiple instances of abuse. Indeed, nothing in the charging documents establishes that Jones's guilty plea involved multiple instances of abuse, and there was not testimony at trial establishing whether the offense involved two or more instances of sexual abuse. Alternatively, the government argues that the district court could have relied on the photograph that was the basis for dismissed count I to conclude that Jones had sexual contact with Jennings before she was

sixteen. But the photograph was the subject of much dispute at trial: the identity of the woman in the photo was heavily disputed, the male in the photo cannot be identified, and the defense challenged the date the photo was allegedly taken. We decline to resolve such factual disputes on appeal. *See Castaneda v. Partida*, 430 U.S. 482, 499 (1977). Instead, the district court should consider the government's alternative arguments for enhancing Jones's sentence on remand.

## VI.

On remand, the district court also must give some reasoned explanation for its restitution award. Here, "Vicky" sought restitution under 18 U.S.C. § 2259, which directs district courts to grant restitution to child pornography victims. But "[r]estitution is . . . proper under § 2259 only to the extent the defendant's offense proximately caused a victim's losses," and the Supreme Court has set out a variety of factors district courts might consider in determining an appropriate restitution award. *See Paroline v. United States*, 572 U.S. 434, 448, 459–60 (2014). At sentencing the district court acknowledged that it needed to "resolve the difference" between the government's $10,000 restitution proposal and Jones's $2,000 restitution proposal. The government's figure was based on documentation mostly prepared by "Vicky's" lawyer, while the defense relied on *United States v. R.V.*, 157 F. Supp. 3d 207 (E.D.N.Y. 2016), where the Eastern District of New York had recently awarded "Vicky" $2,000 in restitution. The district court took the issue of restitution under advisement and then, without explanation or analysis, it adopted the government's proposed restitution figure in the amended judgment. The district court's lack of any explanation for adopting the government's proposal necessitates remand.

Like the Supreme Court, we recognize the abstractness of determining how much of a large indivisible amount to attribute to a particular defendant. It "cannot be a precise mathematical

inquiry," but "involves the use of discretion and sound judgment." *Paroline*, 572 U.S. at 459. The Court instructed:

> [D]istrict courts might, as a starting point, determine the amount of the victim's losses caused by the continuing traffic in the victim's images . . . , then set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses. These could include the number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted); whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of the images; how many images of the victim the defendant possessed; and other facts relevant to the defendant's relative causal role.

*Id.* at 459–60. These factors are not a rigid formula, but rather rough guideposts. *Id.*

But a district court's analysis in this context cannot be entirely opaque. Courts are required by 18 U.S.C. § 2259(b)(2) to issue and enforce restitution orders under § 2259 in accordance with 18 U.S.C. § 3664 in the same manner as an order under the Mandatory Victim Restitution Act, 18 U.S.C. §§ 3663A, 3613A, *see United States v. Gamble*, 709 F.3d 541, 549 (6th Cir. 2013), and "[t]he government bears the burden of proving a victim's actual loss by a preponderance of the evidence," *United States v. Kilpatrick*, 798 F.3d 365, 388 (6th Cir. 2015) (citing 18 U.S.C. § 3664(e)). Our sister circuits have recognized that "[w]hile the determination of the restitution amount is by nature an inexact science, . . . under the [Mandatory Victim Restitution Act], the district court is directed to engage in an expedient and reasonable determination of appropriate restitution by resolving uncertainties with a view toward achieving fairness to the victim," *United States v. Huff*, 609 F.3d 1240, 1248 (11th Cir. 2010) (citations and internal quotation marks omitted), and therefore "[t]he district court must explain its findings with sufficient clarity to

enable [appellate courts] to adequately perform [their] function on appellate review," *id.* (citing *United States v. Gupta*, 572 F.3d 878, 890–91 (11th Cir. 2009)). *See also United States v. George*, 403 F.3d 470, 473–74 (7th Cir. 2005). Because the district court here failed entirely to explain its $10,000 restitution award, we cannot engage in meaningful appellate review. Accordingly, on remand, the district court should redetermine the amount of restitution and provide sufficient analysis to avoid any perception that the restitution figure might have been decided entirely arbitrarily or without consideration of relevant factors like those outlined in *Paroline*, 572 U.S. at 459–60.

## VII.

Jones's convictions are affirmed, but his sentence is vacated, and the case is remanded for resentencing in accordance with this opinion.